UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

THE ESTATE OF MAURICIO JAQUEZ by THE  :
PUBLIC ADMINISTRATOR OF BRONX         :
COUNTY, as Administrator of the goods, chattels  :
and credit of the deceased MAURICIO JAQUEZ,  :
and ANA MARTINEZ, individually and as  :
mother and natural guardian of infants N.J., J.J.,  :
and A.J.,[1]                           :
                                       :
          Plaintiffs,                  :
                                       :
          -against-                    :       **THIRD AMENDED COMPLAINT**
                                       :
CITY OF NEW YORK, and Sergeant         :
WILLIAM FLORES, Shield No. 1023,       :       No. 10-cv-2881 (KBF)
Detective RAYMOND MORRISSEY, Shield    :
No. 6789, Detective RAYMOND FLOOD,     :
Shield No. 744, Detective RICHARD      :
HENDERSON, Shield No. 1033, and Detective  :
DAVID MCNAMEE, Shield No. 7273,        :
individually and in their official     :
capacities,                            :
                                       :
          Defendants.                  :

------------------------------------------------------------------x

---

[1] The full names of infant plaintiffs N.J., J.J., and A.J. have been redacted pursuant to Rule 5.2 of the Federal Rules of Civil Procedure.

1

## NATURE OF THE ACTION

1.      This is an action for damages and attorney fees pursuant to 42 U.S.C. § 1983 and 1988, and the common law of the State of New York.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and the Constitution and laws of the State of New York.

3.      This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a).

4.      Venue lies in the Southern District of New York, pursuant to 28 U.S.C. § 1391, because the events giving rise to this action occurred in this District.

## PARTIES

5.      At the time of the events described herein, the decedent MAURICIO JAQUEZ resided in Bronx County in the City and State of New York.

6.      Plaintiff ANA MARTINEZ is the widow of MAURICIO JAQUEZ, to whom she was married from 2005 until his death on April 12, 2009.

7.      Plaintiffs N.J., J.J., and A.J. are the infant children of MAURICIO JAQUEZ and ANA MARTINEZ.

8.    ANA MARTINEZ brings this case individually and on behalf of N.J., J.J., and A.J., who were born in 1997, 1999, and 2003, respectively, and who are under the age of eighteen.

9.    THE PUBLIC ADMINISTRATOR OF BRONX COUNTY was appointed as fiduciary to Plaintiff THE ESTATE OF MAURICIO JAQUEZ via the issuance of Letters of Administration by the Bronx County Surrogate's Court on June 10, 2009.

10.    Defendant the CITY OF NEW YORK is a municipal corporation domiciled in and organized under the laws of the State of New York. It operates the New York Police Department ("NYPD"), a departmental agency of the CITY OF NEW YORK responsible for the appointment, training, supervision, promotion, and discipline of police officers, including the individual officers named as defendants herein.

11.    Defendant Sergeant WILLIAM FLORES ("Flores"), Shield No. 1023, at all times relevant herein, was an officer, employee and agent of the NYPD. Upon information and belief, at all relevant times herein, Flores was assigned to the Emergency Services Unit. Flores is sued in his individual and official capacities.

12.    Defendant Detective RAYMOND MORRISSEY ("Morrissey"), Shield No. 6789, at all times relevant herein, was an officer, employee and agent of the NYPD. Upon information and belief, at all relevant times herein, Morrissey was assigned to the Emergency Services Unit. Morrissey is sued in his individual and official capacities.

13.    Defendant Detective RAYMOND FLOOD ("Flood"), Shield No. 744, at all times relevant herein, was an officer, employee and agent of the NYPD. Upon

3

information and belief, at all relevant times herein, Flood was assigned to the Emergency

Services Unit. Flood is sued in his individual and official capacities.

14.    Defendant Detective RICHARD HENDERSON ("Henderson"), Shield No.

1033, at all times relevant herein, was an officer, employee and agent of the NYPD.

Upon information and belief, at all relevant times herein, Henderson was assigned to the

Bomb Squad, 6th Precinct. Henderson is sued in his individual and official capacities.

15.    Defendant Detective DAVID MCNAMEE ("McNamee"), Shield No. 7273, at

all times relevant herein, was an officer, employee and agent of the NYPD. Upon

information and belief, at all relevant times herein, McNamee was assigned to the

Emergency Services Unit. McNamee is sued in his individual and official capacities.

16.    At all times relevant herein, all individual defendants were acting under color

of state law.

## STATEMENT OF FACTS

17.    On the morning of April 12, 2009, Easter Sunday, Mr. Jaquez, Ms. Martinez, and their children were in their home at 479 Commonwealth Avenue in the Bronx.

18.    At some point on the morning of April 12, 2009, Ms. Martinez sought medical assistance for Mr. Jaquez by calling 911, and the defendant NYPD officers responded to the residence.

19.    Ms. Martinez and her children were taken to sit in a police car outside the residence, while Mr. Jaquez remained inside.

20.    Ms. Martinez specifically asked the defendant officers not to hurt her husband.

21.    At the time and place of the occurrence, upon information and belief, the defendant officers placed Mr. Jaquez in fear of his life and assaulted and battered Mr. Jaquez using Tasers, rubber bullets, and ultimately semiautomatic firearms, killing Mr. Jaquez in his own apartment.

22.    Upon information and belief, the Tasers, rubber bullets, and firearms used by the defendant officers were issued to them by the NYPD.

23.    Later, Ms. Martinez and her children were taken to the NYPD's 43rd Precinct. After being questioned by defendant officers there, Ms. Martinez was informed that Mr. Jaquez had been killed.

24.    Following Mr. Jaquez's death and the loss of his economic contributions, Ms. Martinez struggled to find stable housing for her family.

25.    From approximately August 24, 2010 until March 18, 2012, Ms. Martinez and her children resided in a homeless shelter.

26.     Prior to Mr. Jaquez's death, Ms. Martinez and Mr. Jaquez had worked together at a restaurant, El Caribe in Harlem, owned by Ms. Martinez's sister.  Mr. Jaquez had acted as the chef and manager of the restaurant, which employed six employees, plus Mr. Jaquez and Ms. Martinez.

27.     The restaurant was sold a year after Mr. Jaquez's death.

28.     All of the conditions precedent to the commencement of the within action against the City of New York have been complied with, in that: (1) on June 16, 2009, within ninety (90) days of Mauricio Jaquez's death, a Notice of Claim was timely served on the City of New York; (2) at least thirty (30) days have elapsed since the service of the Notice of Claim, and adjustment or payment of the claims have been neglected or refused; and (3) this action was commenced within one year and ninety days of the accrual of the causes of action herein stated.

29.     As a direct and proximate result of defendants' actions, the deceased, Mauricio Jaquez, suffered traumatic injuries, pain, mental anguish, and death.

30.     As a direct and proximate result of defendants' actions, Ana Martinez, N.J., J.J., and A.J. sustained pecuniary and non-pecuniary injuries resulting from the loss of love, comfort, society, attention, services and support due to the death of Mauricio Jaquez.

6

## FIRST CAUSE OF ACTION
## AGAINST INDIVIDUAL DEFENDANTS

### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983: Excessive Force

31.    Plaintiffs repeat and re-allege each and every allegation as if fully set forth herein.

32.    At all times material hereto, the individual defendants acted under color of state law.

33.    Upon information and belief, in the course of their contact with Mauricio Jaquez, the individual defendants deliberately and intentionally "Tased" Mauricio Jaquez and shot him with rubber bullets.

34.    Upon information and belief, Mauricio Jaquez posed no immediate threat to the safety of the individual defendants or to any other person.

35.    Upon information and belief, in the course of their contact with Mauricio Jaquez, defendants deliberately and intentionally shot Mauricio Jaquez using live ammunition.

36.    The defendants' intentional shooting of Mauricio Jaquez created a substantial likelihood of death or serious bodily injury to Mr. Jaquez.

37.    Upon information and belief, Mauricio Jaquez posed no significant threat of death or serious physical injury to the defendants or to any other person.

38.    The defendants' use of force, including deadly force, was excessive and unreasonable under the circumstances.

7

39.     By their actions, the defendants deprived Mauricio Jaquez of his clearly-
established rights, guaranteed under § 1983 and the Fourth, Fifth, and Fourteenth
Amendments to the Constitution of the United States, not to be deprived of his liberty
without due process of law, to be free from the excessive and unreasonable use of force
by persons acting under color of state law, and to be free from summary punishment.

40.     As a direct and proximate result of this unlawful conduct, the above-named
Plaintiffs sustained the damages heretofore alleged.

41.     The acts of the individual defendants were motivated by evil motive or intent
and/or were done in reckless or callous indifference to Mr. Jaquez's federally protected
rights.  Accordingly, punitive damages should be imposed in an amount commensurate
with the wrongful acts alleged herein.

## SECOND CAUSE OF ACTION
## AGAINST MUNICIPAL DEFENDANT
### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983: *Monell*

42.     Plaintiffs repeat and re-allege each and every allegation as if fully set forth
herein.

### *Additional Factual Allegations Relating Solely to Municipal Liability*

43.     Municipal defendant the City of New York ("the City") has failed to train its
officers in the proper use of deadly force.

44.     In addition, the City has adopted an unwritten policy and practice within the
NYPD and other city agencies that allows officers to apply deadly force in circumstances
where it is not objectively reasonable.

45.     The aforementioned (a) failure to train and (b) unwritten policy permitting unnecessary deadly force each directly caused the death of Mr. Jaquez, thus violating his federal constitutional rights as set forth above.

46.     Law enforcement professionals around the country have instituted special training and protocols relating to confrontations with emotionally disturbed persons ("EDPs"). These originate in the so-called "Memphis Model," which was a policy put in place in Memphis, Tennessee after a deadly police shooting there in 1987.  Under the Memphis Model, a specially trained Crisis Intervention Team ("CIT"), rather than an Emergency Services or SWAT team, responds to calls requesting medical intervention for emotionally disturbed individuals such as the one at issue here.  The CIT consists of officers with 40 to 80 hours of training in responding to EDP calls. CIT officers are trained in proper techniques for de-escalating a potentially violent situation without the use of force.  For example, CIT officers are taught that shouting at an EDP, surrounding, or threatening him is almost always counterproductive and can, as here, lead to deadly consequences.

47.     Memphis has seen a dramatic decrease in injuries and violence from EDP encounters as a result of its new procedures.  Similar procedures have been put in place by police departments in more than 2000 communities in over 40 states and have been recommended or commended by Amnesty International, the National Alliance on Mental Illness, the U.S. Department of Justice, and the International Association of Chiefs of Police.

48.     Nonetheless, as of the time of the incident at hand, the City has refused to
adopt a similar model despite the long-term, demonstrated reduction in the risk of
violence.

49.     At the time of the incident, the City did not provide adequate training to its
officers regarding how to de-escalate an encounter with an emotionally disturbed person.

50.     The City has a policy and practice of sending police, rather than mental health
or healthcare professionals, to respond to 911 reports of EDPs.

51.     The officers involved in the incident leading to the death of Mr. Jaquez had not
received CIT-type training.

52.     In addition, the City has adopted a municipal custom and practice that
effectively permits or even encourages its officers to use deadly force when such force is
objectively unreasonable and unnecessary. Evidence of the existence of this custom is the
City's effective failure to adequately investigate use-of-force incidents, its nearly
universal indemnification of officers involved in deadly incidents, and its tolerance of the
so-called "Blue Wall of Silence" that exists to prevent police officers from informing on
or testifying against one another. Officers operate in a climate of impunity, knowing that
charges are almost never substantiated against police who shoot civilians.  For example, a
study by the New York Civil Liberties Union found that of all cases of serious
misconduct that were *substantiated* by the Civilian Complaint Review Board between
1998 and 2004, only about one-third led to discipline of the officers involved. *See*
NYCLU, *Mission Failure: Civilian Review of Policing in New York City 1998-2004* at
19-28 (describing how police department disciplinary process effectively condones

misconduct), *available at*

http://www.nyclu.org/files/publications/nyclu_pub_mission_failure.pdf.

53.     The City's failure to properly train its officers in the appropriate use of deadly force and in techniques to de-escalate confrontations with emotionally disturbed persons has led to unnecessary civilian deaths in numerous cases over the past several years. The details of only a few of these cases follow by way of example:

a.  In September 2012, Mohamed Bah was shot and killed by New York City police in his Morningside Heights apartment. Bah's mother had called for an ambulance for her son, but police officers arrived and insisted on confronting Bah despite his refusal and his mother's objections. After determining that Bah was an emotionally disturbed person, officers with police shields, Tasers, and other weapons surrounded the apartment and forced open Bah's front door. Police then proceeded to tase Bah, fire a bean bag at him, and shoot him with at least eight bullets in the head, arms, and torso, causing his death. A lawsuit against the City of New York is currently pending in the Southern District of New York;[2]

b.  In September 2008, Iman Morales, an emotionally disturbed 35-year-old man, was killed by New York City police on Tompkins Avenue in Brooklyn. Morales' mother called the police out of concern for her son when he did not answer his front door. Aware that they were dealing with an emotionally disturbed person, officers in the Emergency Services Unit

---

[2] This lawsuit is currently pending in New York. Oumou Bah v. City of New York, No. 13-Civ-6690.