UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THE ESTATE OF MAURICIO JAQUEZ, *by* :
*The Public Administrator of Bronx County* :
*as administrator of the Good, Chattels and* :
*Credit of the deceased Mauricio Jaquez*, and :
ANA MARTINEZ, :
                                                              :
                            Plaintiffs, :
                                                              :
                    -v- :
                                                              :
THE CITY OF NEW YORK, et al., :
                                                              :
                            Defendants. :

------------------------------------------------------------ X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 8, 2015
```

10 Civ. 2881 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Against the backdrop of a country reckoning with a number of fatal police shootings, this Court faces an excessive force claim involving the fatal shooting of an emotionally disturbed person by several New York City Police Department officers. On April 12, 2009, the wife of Mauricio Jaquez called 911 after her husband had an "emotional breakdown"; she reported that her husband had a knife, but was forced to hang up when her husband grabbed the phone saying that it was a pistol. A team of NYPD officers responded and a struggle ensued during which Mr. Jaquez repeatedly threatened them with a knife. During what was by all accounts a chaotic melee, the team of officers used multiple rounds of Tasers, rubber bullets, and finally live ammunition against Mr. Jaquez. The final bullet entered the back of Mr. Jaquez's head. Ultimately, he was killed.

Plaintiffs, the Estate of Mauricio Jaquez and Ana Martinez, individually and as mother and natural guardian of children N.J., J.J., and A.J. bring this action,

pursuant to 42 U.S.C. § 1983 and state law, against defendant police officers William Flores, Raymond Morrissey, Raymond Flood, Richard Henderson, and David McNamee asserting claims of excessive force, wrongful death, and assault and battery.  (ECF No. 72.)  The Court previously dismissed claims against the City of New York for municipal liability and negligent screening, hiring, retention, training, and supervision.  (ECF No. 84.)

On January 6, 2015, the Court initially granted in part and denied in part defendants' motion for summary judgment.  (ECF No. 128.)  In its decision, the Court noted that the plaintiffs' case rested largely on their proposed expert, Dr. Richard F. Sullivan, and should he be precluded, summary judgment might well be appropriate.  (Transc. of January 6, 2015 proceedings 05:20-06:05, ECF No. 135.)[1] Defendants moved to preclude Dr. Sullivan, pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993) and related case law.  (ECF No. 140.)  On April 10, 2015, the Court granted that motion for reasons it now explains in full. (ECF No. 157.)  Defendants immediately renewed their motion for summary judgment.  (ECF No. 158.)  On April 13, 2015, the Court adjourned the trial and notified the parties that it intended to grant summary judgment in favor of the defendants on the § 1983 claim.  (ECF No. 167.)

When the Court sat down to write the opinion, it became clear that one moment of the altercation between Mr. Jaquez and the officers stood apart from the others: the final shot by Sgt. Flores that entered the back of Mr. Jaquez's head.

---

[1] The City had made a preclusion argument as to Dr. Sullivan in a footnote of its reply brief (ECF No. 123), but the Court did not construe that brief statement as a proper motion.  (Transc. 05:13-05:19, ECF No. 135.)

While the Court grants qualified immunity to each defendant for all conduct preceding that final shot – including the forceful use of the shield, Tasers, Sage guns, and the initial use of live ammunition – it does not with regard to Sgt. Flores. Most situations do not require parsing the events of a single altercation to analyze each specific action a particular officer took. More typically, an event is susceptible to general categorization. Here, that is not the case. The circumstances immediately preceding Sgt. Flores's final use of force are sufficiently different from the remainder of the altercation that this Court must find a triable issue of fact as to Sgt. Flores only.

This case involves an undisputedly chaotic situation during which Mr. Jaquez, an emotionally disturbed person, repeatedly wielded a knife in a threatening manner against a team of police officers. Ultimately, plaintiffs have failed to present any admissible direct or circumstantial evidence to create a triable issue of fact on the objective reasonableness of the use of force, aside from the final shot. Critically, plaintiffs lack evidence to counter the officers' description of what occurred: their sole expert – who proposed to testify to, inter alia, Jaquez's psychological state, law enforcement techniques, ballistics, and forensic pathology – has been precluded. Plaintiffs' reliance on pure speculation and minor inconsistencies in defendants' testimony does not create a triable issue of fact on the reasonableness of force used throughout most of the event.

As to the final use of force – the final shot – the autopsy report reveals and defendant police officers testify that, immediately prior to being shot for the final

time, Mr. Jaquez had been shot in the abdomen, back and right arm, and he was already on the ground.  The officers also testified that he maintained possession of the knife in his right hand and, just prior to Sgt. Flores's final gun discharge, was in the process of pushing up from the ground.

The legal standard governing qualified immunity requires this Court to determine "'if, on an objective basis, it is obvious that no reasonably competent officer would have concluded' . . . in that moment that his use of deadly force was necessary." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  The Court should not apply 20/20 hindsight to merely second-guess police conduct in the context of qualified immunity.  The Supreme Court has determined that qualified immunity serves an important policy purpose: it "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley, 475 U.S. at 341).  Here, though, the lack of a proper expert witness does not preclude a juror from applying common sense to facts that create a triable issue on the reasonableness of firing the final bullet: autopsy report and testimony of Dr. Kristen Landi that at least four other bullets had already entered Mr. Jaquez's body, testimony from officers that Mr. Jaquez had already fallen onto the ground, testimony from officers that there were multiple officers on the scene protected by ballistics gear, testimony from Sgt. Flores that Mr. Jaquez was not threatening

4

anyone with the knife when he fired the last shot, and autopsy records and testimony showing a shot entered just behind Mr. Jaquez's right ear and proceeded directly downward along his spine.

Qualifiedly immune for their conduct, Officers Henderson, McNamee, Flood and Morrissey are dismissed from this action entirely.  Sgt. Flores is granted qualified immunity as to events preceding the final discharge of the firearm.  The two state law claims – assault and battery, and wrongful death – remain only as to Sgt. Flores.  The Court previously dismissed plaintiffs' claims for municipal liability and negligent screening, hiring, retention, training, and supervision.  (ECF No. 84.) As "a § 1983 plaintiff seeking to attach liability to the city for the acts of one of its employees may not rest on the employment relationship alone", the City's dismissal from any § 1983 claim is appropriate.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 394 (1989).

Accordingly, this matter shall proceed to trial as to the use of force by Sgt. Flores during the final moments of the altercation.

I.   FACTUAL BACKGROUND[2]

---

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials. (ECF Nos. 113, 118.) The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted by citation to admissible evidence. See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F.Supp.2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004). To the extent that a party's response fails to directly address straightforward a factual allegation, this failure is considered an admission as a matter of law. See Local Civil Rule 56.1(c); Gubitosi v. Kapica, 154 F.3d 30, 31 n. 1 (2d Cir. 1998); NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y. 2003).  The Court recites only those facts relevant to the claims and defenses currently at issue, but also includes some factual allegations that are not material to the claims asserted but that are important to understanding the context for this case.

The following facts are materially undisputed and all inferences are drawn in favor of plaintiffs.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

On the morning of April 12, 2009, Mr. Jaquez was at home with his wife, Ana Martinez, and children, A.J., N.J., and J.J., when he began "acting crazy" and shouting that the police were going to kill him and were shooting him through the walls.  (Pl. 56.1 Responsive and Affirmative Statement ¶ 5, ECF No. 118.)  At some point after the sun had risen, Mr. Jaquez came out of a room in the apartment screaming "they are going to kill me" while carrying a six inch fillet knife.  (Id. ¶ 13.)  His children woke up to find Mr. Jaquez in the living room holding Ms. Martinez in one hand and grabbing a knife with the other.  (Id. ¶ 14.)  Ms. Martinez was able to dial 911, but Mr. Jaquez grabbed the phone saying it was a pistol he didn't want her making a phone call with it.  (Id. ¶¶ 15-16.)  The operator called back and Ms. Martinez was able to report that Mr. Jaquez had a knife.  (Id. ¶ 17.)  When the police responded, two of the children exited the second floor apartment and told the arriving POs Martinez and Negron that their parents were arguing, their father was "talking crazy", and that he had a knife.  (Id. ¶ 19.)

Realizing that Mr. Jaquez might be an emotionally disturbed person ("EDP"), POs Martinez and Negron called for assistance.  (Id. ¶¶ 20, 20.1.)  Those two officers, as well as Officers Torres and Smith-Sands who had just arrived, continued

---

Plaintiffs formulate their facts as to what occurred using only the following: the Landi Autopsy Report and attempts to undermine the credibility of the officers by showing differences between their versions of events, including differences between the officers' testimony as to when Mr. Jaquez had the knife (though they acknowledge that he did have possession of the knife at various points). Crucially, plaintiffs fail to put forward competent expert testimony on ballistics, forensic pathology, psychiatry, or crime scene reconstruction.

upstairs to the apartment door.  (Id. ¶ 23.)  After the officers knocked and announced their presence, Mr. Jaquez yelled that the police were going to kill him, went into the bedroom and got the knife.  (Id. ¶¶ 23-24.)  Officer Torres managed to pull Ms. Martinez and the last remaining child out of the apartment.  (Id. ¶¶ 25.2, 27, 29.)  At that time, Mr. Jaquez remained agitated, "acted crazy", sweated profusely and had red eyes.  (Id. ¶ 30.)  Ms. Martinez told Sgt. Flores that her husband had a knife and was on drugs (cocaine), but that he did not have any firearms and "he only had that one knife."  (Id. ¶¶ 33, 33.2.)

Members of the New York Police Department Emergency Services Unit ("ESU") arrived on the scene and were told that there had been a family dispute involving a knife, Mr. Jaquez had threatened his family, and he remained in the apartment.  (Id. ¶ 37.)  After attempting to engage Mr. Jaquez in conversation, the officers decided to enter the apartment to confine Mr. Jaquez to a portion of the apartment.  (Id. ¶¶ 42, 45.)  The ESU officers staged up in the kitchen/living room area, wherein Sgt. Flores, the only member of the team who spoke Spanish, spent approximately one hour attempting to communicate with Mr. Jaquez.  (Id. ¶¶ 48, 51.1.)

Meanwhile, Det. Cannizzaro operated a "scout" camera that made its way to the hallway of the apartment.  (Id. ¶ 52.)  Det. Cannizzaro relayed information to the other officers that Mr. Jaquez was walking back and forth from the bedroom to the bathroom, repeatedly putting the knife down as though he was going to peacefully surrender, but then picking it up again.  (Id. ¶¶ 53-54.)  At some point,

Det. Cannizzaro announced to the ESU officers that it appeared Mr. Jaquez had put the knife in the toilet.  (Id. ¶ 56.)  Lt. Goff, who was watching the camera's monitor, saw Mr. Jaquez pick the knife back up and quickly walk out of the bathroom and down the hallway (Id. ¶ 57); but as Mr. Jaquez walked down the hallway, neither Lt. Goff nor Det. Cannizzaro could tell whether he still held the knife.  (Id. ¶ 63.)  While there is some dispute as to whether Mr. Jaquez in fact had the knife at this point, there is no dispute that Det. Henderson then used his Taser on Mr. Jaquez.  Mr. Jaquez reacted as though the Taser made contact and moved back around the corner.  (Id. ¶ 66.)  The officers believed Mr. Jaquez had been disabled by the Taser and proceeded down the hallway towards him.  (Id. ¶ 67.)  At a departmental interview following the incident, Det. Flood stated that Mr. Jaquez "had re-picked up the knife" after the initial Taser deployment (Id. ¶ 61); at his deposition, Det. Flood testified that when he turned the corner, "[Mr. Jaquez] was still on his feet, he was hunched over.  As soon as he saw me, I came up, I hit him with the shield." (Id. ¶ 69, Ex. 15 (Flood, 101:11 – 102:19.))

Det. Flood and Mr. Jaquez then engaged in a struggle, with both men ending up in the bathroom.  (Id. ¶ 73.)  Defendants assert that at this point Mr. Jaquez clearly had possession of the knife, was not complying with anything the officers said, and was swinging wildly, slashing at and trying to stab Det. Flood with the knife.  (Id. ¶ 71.)  Sgt. Flores discharged his Taser at Mr. Jaquez, but Mr. Jaquez kept stabbing at Det. Flood.  (Id. ¶ 72.)  Det. Morrissey shoved Sgt. Flores aside and discharged his Taser at Mr. Jaquez, which "stopped [Mr. Jaquez] momentarily."

(Id. ¶ 75, Ex. I (Henderson), 95:3-5.)  Det. Morrissey eventually pulled Det. Flood out of the bathroom and into the doorway of the bedroom.  (Id. ¶ 78.)  Det. Henderson described the situation as a "melee" and "pretty chaotic".  (Id. ¶ 80, Ex. I (Henderson), 87:19-22.)  The struggle between Mr. Jaquez and Det. Flood happened very quickly and without pause.  (Id. ¶ 81.)

Det. McNamee then stepped up and yelled at Mr. Jaquez to drop the knife. (Id. ¶ 82.)  He fired his Sage gun, striking Mr. Jaquez with three or four less-than-lethal rubber batons or bullets.  (Id. ¶ 83.)  Mr. Jaquez reacted by "growling" or "screaming" when hit by the rubber batons; more than one rubber baton hit Mr. Jaquez on his right forearm.  (Id. ¶ 84, Ex. L (Morissey), 104:9-22; Ex. 17 (Autopsy Photo).)  The rubber batons did not appear to cause Mr. Jaquez to step back, slow down, or otherwise deter him from swinging his knife at Det. McNamee. (Id. ¶ 84).

Det. McNamee was pushed out of the bathroom and "backpedaled a little bit" into the hallway.  (Id. ¶¶ 85, 86, Ex. K (McNamee), 127:6-12, 125:17 – 126:3.)  While the parties dispute whether Mr. Jaquez's knife then came in contact with Det. McNamee's Sage gun, photographs of the gun taken by the crime scene unit ("CSU") show what CSU described as "possible scrape marks on the cylinder portion" of the Sage.  (Id. ¶ 87, Ex. 19 (CSU Photos).)  Ultimately, CSU did not conclude that there was damage to the weapon or that damage came from a knife.  (Id., Ex. 20 (CSU Report).)  Det. McNamee pushed Mr. Jaquez away from him, and Det. Morrissey observed that Mr. Jaquez ricocheted off the bathroom doorframe and "came back

with the knife to . . . McNamee's throat." (Id. ¶¶ 88, 89, Ex. L (Morrissey), 107:16-21.)  Det. Flood described Mr. Jaquez as standing upright and lunging forward, moving his right arm in a downward stroke toward Det. McNamee.  (Id. ¶ 94, Ex. J (Flood), 104:10-13, 104:19-105:6.)  Det. McNamee testified that he felt Mr. Jaquez hit him in the neck and that he felt the metal of the knife against the side of his head, behind his ear.  (Id. ¶ 90, Ex. K (McNamee), 128:7-19.)  Det. McNamee stated in his departmental interview that he "[felt Mr. Jaquez's] hands on my neck, between my neck and my helmet at one point."  (Id. ¶ 101.)[3]  Det. Morrissey described Mr. Jaquez as being like a machine as he first struggled with Det. Flood and then with Det. McNamee.  (Id. ¶ 129, Ex. L (Morrissey), 125:10-21.)

Sgt. Flores testified that, at some point during the struggle, Mr. Jaquez and Det. McNamee were on top of each other, with Mr. Jaquez stabbing at Det. McNamee, who was in turn using the Sage gun to fend him off.  (Id. ¶ 105.)  It was then that Det. Morrissey discharged his gun inside the bedroom, aiming at the right side of Mr. Jaquez's torso.  (Id. ¶ 103.)  Sgt. Flores also discharged two or three shots from his gun.  (Id. ¶¶ 106, 108.)

After the initial use of live ammunition, Mr. Jaquez was on the ground.  (Id. ¶ 114.)  The autopsy report indicates that at least four bullets had, at this point, struck Mr. Jaquez; each bullet entered Mr. Jaquez's body in a downward trajectory.  (Id. ¶¶ 1.7-1.36; Ex. 4 (Landi Autopsy Report).)  Multiple officers, equipped in ballistics gear, were present when Mr. Jaquez was shot and on the ground.  The

---

[3] Audio recordings of Captain Morales, Det. Flood and Det. Morrissey's NYPD departmental interviews are part of the record.  (Morris Aff. ¶¶ 14, 15, 27, ECF No. 117.)  The Court has received the recordings and, while the sound is faint, listened to them carefully.

officers testify that, after the initial shots, Det. McNamee went down to remove the

knife from Mr. Jaquez's hand when Mr. Jaquez pushed up towards Det. McNamee.

(Id. ¶ 114.) Sgt. Flores testified at deposition:

> Q: Was he using both of his hands to get himself up?
> A: Yes.  He had both his hands in front of him, right underneath him.
> Q: So, he wasn't threatening anyone with the knife, at that point; right?
> A: At that point, no. He had the knife in his hand, in his right hand, and he's
> in, like, push-up position, getting himself – gathering his feet, gathering
> himself to get up."

(Id. ¶¶ 115, 115.2, Ex. M (Flores), 107:18-108:06.)  Det. Morrissey also testified at

deposition that Mr. Jaquez maintained possession of the knife after he fell to the

floor and that, "Detective McNamee reached down to try to remove the knife from

his hand, and at that point, Mr. Jaquez did like a one-handed pushup off the ground

and started to stab at Detective McNamee again."  (Id. ¶ 114, Ex. L (Morrissey),

115:15-115:19.)[4]

    As Mr. Jaquez pushed up, Sgt. Flores, who was at this point behind Mr.

Jaquez, discharged his gun one final time, from three or four feet away.  (Id. ¶ 115.)

The final bullet "entered the right side of [Mr. Jaquez's] head immediately behind

his right ear."  (Id. ¶ 1.12.)  The trajectory of that bullet was "directly downward".

(Id. ¶¶ 1.13, 1.14, Ex. 1 (Deposition of Dr. Kristen Landi), 29:02-29:06, 33:21-

34:03.)[5]  After that shot, Det. McNamee knocked the knife out of Mr. Jaquez's hand

---

[4] Det. Morrissey acknowledged at his deposition that this testimony contradicted his previous
statement at a department interview wherein he said that Sgt. Flores had shot the final bullet while
Mr. Jaquez was on the ground but not attacking anyone – before Mr. Jaquez pushed up from the
ground and slashed at Det. McNamee.  (Id. at 172:03-172:13; Morris Aff. ¶ 27, ECF No 117.)
[5] Dr. Landi repeatedly testified at deposition that she could not form a conclusion about the position
of Mr. Jaquez's body when he was shot; but she agreed with plaintiff counsel's question, to which
defense counsel objected, that there was nothing about the wound that was "inconsistent with [Mr.
Jaquez] being on his knees when he was shot."  Id.  The statement, amounting to agreement with

using an ASP and a Halligan tool.  (Id. ¶¶ 121, 123.)  The officers handcuffed Mr. Jaquez and called EMS.  (Id. ¶ 124.)

The struggle between Mr. Jaquez and Det. McNamee unfolded very quickly, and Det. McNamee testified that the "entire thing from [Mr. Jaquez] appearing in the hallway to us handcuffing him was seconds."  (Id. ¶¶ 119, 126.)  Det. Henderson described the series of events happening all at once and Det. Morrissey agreed that "it happened so fast . . . ."  (Id. ¶¶ 119, 127, Ex. I (Henderson), 101:16-19, Ex. L (Morrissey), 151:21-152:07.)

Mr. Jaquez was declared dead on arrival at 11:50 a.m. at Jacobi Medical Center.  (Id. ¶ 1.6.)

## II.   PROCEDURAL HISTORY

On April 2, 2010, the Estate of Mauricio Jaquez by the Public Administrator of Bronx County, as Administrator of the Goods, Chattels, and Credits of the deceased Mauricio Jaquez, filed this action against the City of New York and unnamed New York City Police Officers John Does.  (ECF No. 1.)  On November 16, 2011, the action was reassigned from the Honorable Thomas P. Griesa to the undersigned.  (ECF No. 5.)  On January 24, 2012, plaintiffs' counsel withdrew from the case.  (ECF No. 11.)  The next day, the Court Ordered the City of New York to identify the John Doe police officer defendants involved in the alleged incident,

---

plaintiff's conjecture, is pure speculation and is excludable in all events under F.R.E. 403.  See, e.g., People v. Boop, 118 A.D.3d 1273, 1275 (4th Dep't 2014) (trial court was correct to exclude testimony of the Medical Examiner "with respect to whether the victim could have sustained certain injuries while moving within the vehicle" because it "would have been speculative and misleading").  On summary judgment, the Court may only rely on admissible evidence.  See Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (noting that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment" (internal citation omitted)).

pursuant to <u>Valentin v. Dinkins</u>, 121 F.3d 72 (2d Cir. 1997).  (ECF No. 12.)  The Court further Ordered plaintiffs, now appearing <u>pro se</u>, to thereafter file an amended Complaint.  (ECF No. 12.)  On April 2, 2012, the Court Ordered plaintiffs to file an amended Complaint no later than April 12, 2012.  (ECF No. 16.)  Plaintiffs failed to comply with the Court's Order and on April 30, 2012, the Court dismissed the action pursuant to Federal Rule of Civil Procedure 41.  (ECF No. 17.)

On June 28, 2012, plaintiff, once again counseled, filed a motion for relief from the dismissal pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. (ECF No. 25.)  On November 28, 2012, the Court denied plaintiffs' motion.  (ECF No. 33.)  Plaintiffs appealed and on November 7, 2013, the Court received a mandate from the Second Circuit, reversing and reinstating the action.  (ECF No. 39.)  Thereafter, the parties engaged in discovery.

On March 3, 2014, plaintiffs the Estate of Mauricio Jaquez, Ana Martinez, and N.J., J.J., and A.J., by their mother and natural guardian Ana Martinez, filed the Third Amended Complaint, alleging claims of excessive force, municipal liability, wrongful death, assault and battery, and negligent screening, hiring, retention, training, and supervision against defendants the City, Sergeant William Flores, Detective Raymond Morrissey, Detective Richard Henderson, and Detective David McNamee, pursuant to 42 U.S.C. §§ 1983 and 1988.  (ECF No. 72.)

On June 9, 2014, the Court dismissed plaintiffs' claims for municipal liability and negligent screening, hiring, retention, training, and supervision.  (ECF No. 84.)

On December 15, 2014, defendants moved for summary judgment.  (ECF No. 111.)  At a conference on January 6, 2015, the Court granted in part and denied in part defendants' motion for summary judgment, finding that questions of fact remained as to qualified immunity on the excessive force claims.  (ECF No. 128.)  The Court stated:

> This has, I think, clear importance for trial because if it turned out that Dr. Sullivan were struck and his testimony were no longer available because he was struck by way of a <u>Daubert</u> challenge, then there might be a motion, for instance, for a directed verdict because there certainly wouldn't be that kind of evidence at trial.  There's no other place for it to come from.  Similarly, there's nothing to prevent the Court from entertaining an oral motion on summary judgment right before trial if it turned out that he's struck and there's nothing to fill in the blanks.

(Transc. 05:20-06:05, ECF No. 135.)

On March 30, 2015 defendants moved to preclude the expert testimony of Dr. Sullivan pursuant to <u>Daubert</u>, 509 U.S. 579, and related case law.  (ECF No. 140.)  On April 10, 2015, the Court issued an order precluding the expert testimony of Dr. Sullivan, for reasons it now explains in full.  (ECF No. 157.)  In light of the preclusion, defendants renewed their motion for summary judgment later that day, citing the statement from the Court at the January 6, 2015 conference.  (<u>See</u> Transc. 05:20-06:05, ECF No. 135.)  On April 13, 2015, the Court adjourned trial for the reasons on which it now elaborates.  (ECF No. 167.)

III.   PROPOSED TESTIMONY OF DR. SULLIVAN

Pursuant to Fed. R. Civ. P. 26, plaintiffs designated Dr. Richard F. Sullivan, an emergency medicine physician practicing in Massachusetts, to render opinions in three areas: (1) the NYPD's handling of emotionally disturbed persons, specifically

that the officers "exacerbated" Mr. Jaquez's "unhinged state" and should have "simply waited for him to calm down" (Myrvold Decl., Ex. A ("Sullivan Report") at 1-2, ECF No. 141); (2) the trajectory of bullets, specifically that Mr. Jaquez was already on the ground when the initial shots were fired and "was on his knees or belly when he was shot directly down into his head" (id. at 3-5); and (3) the effects of the wounds, specifically that the shots would have "very rapidly extinguished any possible threat that Mr. Jaquez could have posed" and that it would have been impossible for him to have pushed up immediately before the final shot was fired (id. at 5-6).  Dr. Sullivan, however, concedes that he is not a psychiatrist, has only treated "four or five" gunshot wounds in his entire career, has never studied crime scene reconstruction, is not qualified to testify about police tactics, and has no expertise in forensic pathology.  As discussed below, plaintiffs' choice of Dr. Sullivan as its expert witness is surprising as he is singularly unqualified in the necessary areas.

A.   Daubert Standard

"[E]xpert testimony may help a jury understand unfamiliar terms and concepts."  United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  A trial court has an obligation, however, to act as a gatekeeper with respect to expert testimony.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).  This is due in large part to the fact that an expert is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge

or observation." Daubert, 509 U.S. at 592.  The court's role as a gatekeeper is

therefore necessary.

"The primary locus of this obligation is [Federal Rule of Evidence] 702, which

clearly contemplates some degree of regulation of the subjects and theories about

which an expert may testify."  Daubert, 509 U.S. at 589.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help
> the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of
> the case.

Fed. R. Evid. 702.  Thus, this Court's inquiry into whether an expert meets Rule

702's requirements includes a review of (1) the qualifications of the proposed expert;

(2) whether each proposed opinion is based upon reliable data and reliable

methodology; and (3) whether the proposed testimony would be helpful to the trier

of fact.  See, e.g., Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005);

Arista Records LLC, et al. v. Lime Grp. LLC, et al., No. 06-cv-5936 (KMW), 2011

WL 1674796, at *1 (S.D.N.Y. May 2, 2011).

The "overarching subject" of the Rule 702 inquiry is "the evidentiary

relevance and reliability—of the principles that underlie a proposed submission.

The focus, of course, must be solely on principles and methodology, not on the

conclusions they generate."  Daubert, 509 U.S. at 595.

However, even otherwise qualified experts may not simply offer conclusory opinions. Major League Baseball, 542 F.3d at 311; Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir. 2000). Conclusory opinions are a form of "ipse dixit," and often provide an insufficient basis upon which to assess reliability. See, e.g., Nimely, 414 F.3d at 396.

1.    Qualifications

Inquiry into a proposed expert's qualifications is a threshold question that seeks to determine whether the proposed expert is, in fact, an expert at all in the area in which he or she intends to testify. See Daubert, 509 U.S. at 592 n.10; Arista Records, 2011 WL 1674796, at *2. Put simply, without the requisite qualifications, the reliability of a proposed expert's testimony is in serious doubt.

Whether a proposed expert is qualified depends on his or her educational background, training, and experience in the field relevant to the opinions that he or she seeks to express. See id.; see also United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."); Cary Oil Co., Inc. v. MG Refining & Mktg., Inc., No. 99-cv-1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003).

In the Second Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." See Daubert, 509 U.S. at 588–89; In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d

17

531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has the equivalent relevant practical experience.").  If an expert's training and experience are in a field closely related to the area to the proposed testimony, that may, in appropriate circumstances, be sufficient to meet Rule 702's qualification standards.  See Arista Records, 2011 WL 1674796, at *3; Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04-cv-7369 (LTS), 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006).

        2.     Reliability

The reliability of a proposed expert's testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592–93.  Among the questions to be answered are whether the theory or methodology can be tested, whether it has been subjected to peer review, whether it has a potential rate of error, and whether there is "general acceptance" of the methodology or theory.  Id. at 593–94.

There are, however, limitations that a court can, and indeed sometimes must, place upon even a qualified expert proposing to testify as to some admissible opinions.  For instance, the court may preclude an expert from testifying as to the credibility of other witnesses or evidence.  See United States v. Scop, 846 F.2d 135, 142 (2d Cir.), modified on reh'g, 856 F.2d 5 (2d Cir. 1988); In re Blech Secs. Litig., No. 94-cv-7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003); Linkco,

18

Inc. v. Fujitsu Ltd., No. 00-cv-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July

16, 2002).

Furthermore, an opinion that is speculative or conjectural does not satisfy

Rule 702 and should be excluded.  See Daubert, 509 U.S. at 590 ("[T]he word

'knowledge' connotes more than subjective belief or unsupported speculation.");

Major League Baseball, 542 F.3d at 311.  While the Daubert inquiry is "flexible"

and intended to give the Court the "discretion needed to ensure that the courtroom

door remains closed to junk science," it is also true that, to warrant admissibility, "it

is critical that an expert's analysis be reliable at every step."  Amorgianos v. Nat'l

R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

3.     Helpfulness to the trier of fact

Expert testimony must be helpful to, but not usurp the province of, the trier

of fact.  Bilzerian, 926 F.2d at 1294; Marx & Co. v. Diners' Club, Inc., 550 F.2d 505,

512 (2d Cir. 1977).

Federal Rules of Evidence 401, 402, and 403 govern the inquiry of whether an

individual qualified as an expert, using reliable methodologies, is proffering

testimony that is both admissible and should be allowed.  Rule 403, which provides

for the exclusion of otherwise relevant evidence "if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury," is applicable to the Court's inquiry in this regard.  Daubert,

509 U.S. at 595 (quoting Fed. R. Evid. 403).

Furthermore, expert testimony may not usurp the province of the judge to

instruct on the law, or of the jury to make factual determinations.  See Bilzerian,

926 F.2d at 1294; <u>Marx & Co.</u>, 550 F.2d at 510–11.  While an expert "may opine on

an issue of fact within the jury's province, he may not give testimony stating

ultimate legal conclusions based on those facts."  <u>Bilzerian</u>, 926 F.2d at 1294.

Moreover, "[a]lthough testimony concerning the ordinary practices in [an] industry

may be received to enable the jury to evaluate a defendant's conduct against the

standards of accepted practice, <u>Marx</u>, 550 F.2d at 509, testimony encompassing an

ultimate legal conclusion based upon the facts of the case is not admiss[i]ble, and

may not be made so simply because it is presented in terms of industry practice."

<u>Id.</u> at 1295.

      B.      <u>Preclusion of Dr. Sullivan's Proposed Testimony</u>

      Dr. Sullivan's proposed testimony is, according to his deposition testimony,

based largely on "common sense opinion", "simple geometry" and "absolutely gospel

truth".  (Myrvold Decl., Ex. C ("Sullivan Depo.") at 83:11, 77:01, 80:16, ECF No.

141.)  His opinions are not based on any methodology, scientific research, or testing,

but rather largely consist of <u>ipse dixit,</u> conclusory interpretations of the autopsy

report and deposition testimony.  Regarding the handling of emotionally disturbed

persons, Dr. Sullivan states, "The picture of him standing alone and swaying back

and forth as described by police officers following him with a robotic camera is

suggestive of psychosis."  (Sullivan Report at 3.)  He continues, "[Mr. Jaquez] most

probably also perceived that he was being followed remotely (robotic cameras).  I

have no doubt that if the officers had simply waited for Mr. Jaquez to calm down, he

would eventually have become calm enough to be safely take [sic] into custody."  (<u>Id</u>.

at 3-4.)  Regarding the use of non-lethal force, Dr. Sullivan opines, "I don't believe that Tasers should be used unless someone is in danger, unless either the person who is being Tased or the police, if they have reason to believe that they are under imminent threat, it seems appropriate to me to use a Taser, but anything less than that, I would never have used it.  I don't believe it's appropriate in this case."  (Id. at 62:02-62:09).  Regarding the effects of the wounds, Dr. Sullivan opines that "there is no question that [one of the bullet wounds] would have been devastating and would have very rapidly extinguished any possible threat that Mr. Jaquez could have posed. . . . It is impossible that he could have posed any significant threat to the officers under such circumstances."  (Sullivan Report at 5.)  Regarding the bullet trajectory, he explains that Mr. Jaquez was shot from above, pointing to the trajectory of the bullets and that "if the person was vertical, was standing up, they came from above him and there is no – I find no point at which, in the depositions that I have seen, that he was ever off his feet before the shots were fired."  (Id. at 65:19-65:25.)  Based upon Dr. Landi's autopsy report on the trajectory of the bullets, Dr. Sullivan has "concluded to a reasonable degree of medical certainty that the deposition testimony given by the officers regarding Mr. Jaquez's position at the time of the initial shots was not true."  (Sullivan Report at 5.)  While acknowledging that he is not an expert in the field of crime scene reconstruction, Dr. Sullivan explains, "I mean, honestly, this is geometry, it's nothing more than geometry, and a straight line is a straight line and the beginning of something and the end of something – the wounds have to be a continuation of a straight line to the muzzle of

the gun that fired the bullets." (Sullivan Depo. at 75:19-75:24.) Dr. Sullivan admitted that his analysis of bullet trajectory is less an area of medicine, but rather "[i]t is simple geometry . . . I would think that most anyone could understand it." (Id. at 76:21-77:06.)

Dr. Sullivan is an emergency room physician who explains in his report that he volunteered to work on the case because plaintiffs' counsel, "a close personal friend for the past 30 years, asked me to do so and in discharge [sic] my civic duty to assist Ms. Martinez and her children, who were grievously injured by the irresponsible actions of the police officers who shot and killed her husband." (Sullivan Report at 3.) Dr. Sullivan consulted informally with a forensic pathologist in formulating his expert report because he "wanted the opinion of someone who had more formal training in the field than I did" but refused to reveal her name. (Sullivan Depo. at 44:18-44:19.) Indeed, hundreds of qualified experts exist who could have opined on certain topics proposed by plaintiffs and could have helped a jury understand the chaotic situation in the apartment. However, plaintiffs instead rested the weight of their case on a physician whose entire experience with gunshot wounds amounts to having seen them four or five times in his career in the emergency room in Massachusetts. Dr. Sullivan's proposed testimony falls well short of the qualification, reliability and helpfulness standards set forth in Daubert and its progeny.

1.      Qualification

Dr. Sullivan is an emergency medicine doctor who has practiced medicine in

an emergency room setting his entire career.  He is undoubtedly an intelligent

physician with impressive emergency medicine credentials.  (Myrvold Decl., Ex. B

("Sullivan Resume"), ECF No. 141.)  Nonetheless, Dr. Sullivan's expertise lies in

emergency medicine and not in the areas in which he seeks to opine.  The mere

possession of a medical degree does not qualify one to be an expert in all medically

related fields.  See In re Fosamax Products Liability Litigation, 807 F. Supp. 2d 168,

183 (S.D.N.Y. 2011) (finding that the physician expert "may not offer testimony

about the comparative efficacy of Fosamax to the drug Forteo, because he has not

based this opinion on sufficient facts beyond his own clinical experience, and

therefore such testimony could mislead the jury."); Morritt v. Stryker Corp., 973 F.

Supp. 2d 177, 188 (E.D.N.Y. 2013) ("Plaintiffs have failed to show that Dr.

Montalbano's expertise in orthopedic medicine and surgical principles and concepts

qualifies him to testify as to the mechanical functioning of a medical device.").

Emergency room doctors may see some of everything, but it does not make them

experts in everything.  See Nimely, 414 F.3d at 399 n.13 "([B]ecause a witness

qualifies as an expert with respect to certain matters or areas of knowledge, it by no

means follows that he or she is qualified to express expert opinions as to other

fields").  In fact, Dr. Sullivan was precluded by another court in this district from

testifying on particular aspects of the injuries suffered by that plaintiff.  See Tatum

v. City of New York, No. 06-cv-4290 (PGG), 2009 WL 1748044 (S.D.N.Y. June 19,

2009) ("Plaintiff has not shown that Dr. Sullivan—as an emergency room doctor who may have experience in initially diagnosing, stabilizing, and providing pain medication for the type of injuries Plaintiff suffered, but who apparently does not otherwise treat such injuries—is qualified to testify as an expert concerning the long-term effects of Plaintiff's April 29, 2005 injury and the cause(s) of his current medical problems.") (internal citation omitted).

Dr. Sullivan first seeks to opine on the handling of EDPs.  He states that Mr. Jaquez was in a state of "psychosis" and that the officers "exacerbated Mr. Jaquez's unhinged emotional state by appearing in elaborate body armor and helmets, brandishing impressive weapons such as the Sage device, and screaming at him." (Sullivan Report at 3.)  Dr. Sullivan suggests that he has "no doubt" that the officers would have been able to safely take Mr. Jaquez into custody had they "simply waited for Mr. Jaquez to calm down."  (Id. at 4.)  Dr. Sullivan, however, is not a board certified psychiatrist nor has he dealt with EDPs outside the hospital emergency room.  (Sullivan Depo. at 23:25-27:15.)  He has never been a member of law enforcement.  Any knowledge of police tactics for dealing with EDPs comes from his experience receiving EDPs after they had been placed into custody and brought to the emergency room.  (Id. at 27:16 – 29:16.)  That is insufficient to qualify in psychiatry and/or law enforcement handling of EDPs.

Dr. Sullivan also seeks to opine on bullet trajectories and the effect of wounds on Mr. Jaquez.  He looked at the Landi Autopsy Report and, based on "simple geometry" (Sullivan Depo. at 77:01), "concluded to a reasonable degree of medical

24

certainty that the deposition testimony given by the officers regarding Mr. Jaquez's position at the time of the initial shots was not true." (Sullivan Report at 5.) Specifically, he states based on the downward trajectory of the bullet wounds that Mr. Jaquez "was on the ground when four out of five of the shots were fired." (Id. at 6.) He also states that, based on the wounds he suffered, Mr. Jaquez "would have been completely incapacitated in a matter of only a few moments" and he "posed no conceivable threat to anyone after [one of the bullet wounds] was inflicted." (Id. at 5-6.)

Dr. Sullivan again lacks the requisite qualifications to testify regarding bullet trajectories or effect of the wounds.[6]  The entirety of Dr. Sullivan's experience in this area amounts to having seen "four or five" gunshot wounds in the roughly 25 years of his working in hospitals. (Id. at 33:19-34:18.) None of those instances involved mortal wounds. (Id. at 34:16-34:18.) He has never received training in ballistics, crime or accident scene reconstruction, police practices or procedures, or criminal justice. (Id. at 22:24-23:11, 24:11-24:12, 25:09-25:24, 35:25-36:08, 37:09-37:14.) Dr. Sullivan admitted that he is not an expert in the area of forensic pathology. (Id. at 25:22-25:24.) He consulted with an unidentified forensic pathologist in connection with the formation of his opinions, testifying: "Q: Is this just in recognition of the fact that you lack expertise in the area of forensic pathology? A: Precisely. …" (Id. at 44:20-44:24.) Dr. Sullivan did not reveal her name because "I don't think she wants to get involved in the case." (Id. at 44:13-

---

[6] That the New York State Supreme Court qualified Dr. Sullivan to testify about bullet trajectories in People v. Jerome Williams (testimony at ECF No. 154-3) is irrelevant to this Court. As set forth, Dr. Sullivan is not a proper expert on this topic under Daubert.

44:14.)  Dr. Sullivan never examined or treated Mr. Jaquez and he has not set forth a basis of expertise for opining on the biomechanical effects of the trauma sustained by Mr. Jaquez.  Dr. Sullivan testified that his opinions are "simple geometry" that "most anyone could understand."  (Id. at 76:21-77:06.)  That is insufficient to qualify as an expert.

Dr. Sullivan is accordingly not qualified to offer opinion testimony regarding the handling of EDPs, crime scene reconstruction / bullet trajectory, or the effect of the wounds on Mr. Jaquez.  This precludes his testimony in its entirety.

2.  Reliability

Dr. Sullivan's testimony falls dramatically short of the required standards of reliability.  Dr. Sullivan seeks to testify as to how the police exacerbated Mr. Jaquez's emotional state.  He provides opinions regarding the exacerbating effect of the officers' appearances, weaponry, and the timing of their entry, but he fails to provide any of the following: citations to studies regarding EDPs, testing he conducted, science he consulted, methodology he used, or the names of people with whom he spoke.  His submissions lack any foundation that would demonstrate the reliability of his opinions.  His opinions are conclusory and classic ipse dixit.  See Nimely, 414 F.3d at 396.  Dr. Sullivan cannot assist the trier of fact where his opinions amount to mere speculation as to how different police tactics (such as waiting longer before engaging Mr. Jaquez) would have led to different results.

Dr. Sullivan also advances no methodology to support his conclusions regarding the bullet trajectories.  He opines on the relative positions of the shooters

and Mr. Jaquez based primarily on the wound trajectories of the bullets referenced in the autopsy report. (Sullivan Report at 3-4.) The autopsy report by itself says nothing about relative body positions, but instead shows angle descriptions of wounds as applied to a stationary body viewed in standard anatomical position. (Landi Autopsy Report.) The limitations inherent in the report is the reason why Dr. Landi, the forensic pathologist from the Office of the Chief Medical Examiner who performed the autopsy on Mr. Jaquez, would only make conclusions about the orientation of the barrel of the gun relative to the skin surface, and would not say anything about the orientation or positions of the people in the apartment. (Myrvold Decl., Ex. E ("Landi Deposition") at 28:19-30:23, ECF No. 141.) Dr. Sullivan bases his opinions regarding bullet trajectory on "simple geometry" (Sullivan Depo. at 75:11-77:01), but his report – which only amounts to about 2.5 pages of opinions and conclusions – omits facts upon which one could base geometric calculations.[7] The report makes no mention of testing he did or formulas on which he relied. Dr. Sullivan admitted at deposition that he was not relying on "pharmacology or emergency medicine" to form his opinion that Mr. Jaquez was shot from above, but that "it's absolutely gospel truth." (Id. at 80:12-80:16.)[8] Dr.

---

[7] Such facts might have included, at the very least, a floor plan, photographs or diagrams showing the location of physical evidence, or diagrams regarding the height and weight of the officers and Mr. Jaquez.

[8] Dr. Sullivan also had the following exchange at deposition:

      Q. You testified before that you were not an expert in crime scene reconstruction or accident scene reconstruction, correct?

      A. I'm not a recognized expert in those fields, yes.

      Q. But, in affect [sic] isn't that what you are doing by taking the deposition testimony and taking the autopsy findings or the autopsy report and attempting to reconstruct what happened here?

Sullivan's conclusory opinions are a classic form of <u>ipse dixit</u>, and provide an insufficient basis upon which to assess reliability.

Similarly, Dr. Sullivan's testimony regarding the effects of the wounds is unreliable and simply <u>ipse dixit</u>.  In his report, Dr. Sullivan reaches the conclusion that it "would have been impossible" for Mr. Jaquez to have pushed up from the floor at the moment immediately before the shot in the back of his head, but he again fails to base his opinions on any methodology or science.  (Sullivan Report at 5.)

      3.    <u>Helpfulness to the trier of fact</u>

Dr. Sullivan's expert testimony is not helpful to the jury because he usurps their role in making factual determinations.  Dr. Sullivan largely bases his opinion on "common sense opinion", "simple geometry" and "absolutely gospel truth". (Sullivan Depo. at 83:11, 77:01, 80:16.)  For example, when attempting to place the shooting officers in relation to Mr. Jaquez based on the autopsy report, Dr. Sullivan explains that his analysis amounts to "simple geometry" and "I would think that most anyone could understand it.  I'm surprised of how much difficulty we are having coming to an agreement today."  (<u>Id</u>. at 77:01-77:06.)  That Dr. Sullivan fails to add a layer of expertise or cogent analysis beyond that which a lay jury would so clearly understand reveals the problem: his testimony contains conclusions drawn from his personal interpretation of limited evidence.  He makes improper credibility

---

      A. I don't believe so. I mean, honestly, this is geometry, it's nothing more than geometry, and a straight line is a straight line and the beginning of something and the end of something – the wounds have to be a continuation of a straight line to the muzzle of the gun that fired the bullets. (Sullivan Deposition at 75:11-75:24.)

determinations when opining "to a reasonable degree of medical certainty that the deposition testimony given by the officers regarding Mr. Jaquez's position at the time of the initial shots was not true." (Sullivan Report at 5.) He offers ultimate legal conclusions of the facts in his report, doing little more than tell the jury what result to reach. See United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("When this occurs, the expert acts outside his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed decision."). In short, his speculative readings of the evidence amount to little more than common sense interpretations of the evidence – a role well-suited for a jury.

## IV.   QUALIFIED IMMUNITY

### A.   Summary Judgment in Qualified Immunity Cases

Qualified immunity shields police officers from personal liability for civil damages as a result of their performance of discretionary functions and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

To determine whether an official is entitled to qualified immunity, courts first look to whether the plaintiffs' allegations, if true, establish a constitutional violation. Harlow, 457 U.S. at 816. Next, courts must decide whether it was

"objectively reasonable" for the officer to believe that his or her actions were lawful "in light of the legal rules that were clearly established at the time [action] was taken." Anderson v. Creighton, 483 U.S. 635, 638-39 (1987).[9] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001.)

Law enforcement officers may use only such force as is objectively reasonable under the circumstances. Id. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989). The inquiry into a Fourth Amendment excessive use of force claim is not assessed with 20/20 hindsight, but "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Salim v. Proulx, 93 F.3d 86, 92 (2d Cir. 1996). The objective reasonableness test will not be met "'if, on an objective basis, it is obvious that no reasonably competent officer would have concluded' . . . in that moment that his use of deadly force was necessary." O'Bert, 331 F.3d at 37 (quoting Malley, 475 U.S. at 341). In other

---

[9] The Supreme Court has subsequently reconsidered this two-step protocol, finding that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

words, a court should ask if "officers of reasonable competence could disagree" on the legality of the officer's actions.  <u>Malley</u>, 475 U.S. at 341.  If there could be disagreement, qualified immunity is appropriate.  <u>See id</u>.  This level of inquiry is appropriate so that the courts do not engage in "endless second-guessing of police decisions made under stress and subject to the exigencies of the moment."  <u>Scott v. Henrich</u>, 39 F.3d 912, 915 (9th Cir. 1994).

An officer may use deadly force if he "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others", and the officer, if feasible, warns the suspect before using deadly force.  <u>Tennessee v. Garner</u>, 471 U.S. 1, 3, 11-12 (1985); <u>see also</u> <u>Graham</u>, 490 U.S. at 396 (to determine whether force used to effect a particular seizure is reasonable, a court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.")

In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255.  Summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant "show[s] that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of

clearly established law." <u>Ford v. Moore</u>, 237 F.3d 156, 162 (2d Cir. 2001).  Even

though a reasonableness inquiry traditionally is a question of fact for the jury, "in

qualified immunity cases, we are not concerned with the correctness of the

defendants' conduct, but rather the 'objective reasonableness' of their chosen course

of action given the circumstances confronting them at the scene." <u>Lennon v. Miller</u>,

66 F.3d 416, 421 (2d Cir. 1995).  "[W]here the factual record is not in serious dispute

. . . [t]he ultimate legal determination whether, on the facts found, a reasonable

police officer should have known he acted unlawfully is a question of law better left

for the court to decide." <u>Warren v. Dwyer</u>, 906 F.2d 70, 76 (2d Cir. 1990); <u>see also</u>

<u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526-27 (1985).

     In a deadly force case where "the witness most likely to contradict [the police

officer's] story—the person shot dead—is unable to testify . . . the court may not

simply accept what may be a self-serving account by the police officer." <u>O'Bert</u>, 331

F.3d at 37 (quoting <u>Scott</u>, 39 F.3d at 915).  Rather, the Court must also consider

"circumstantial evidence that, if believed, would tend to discredit the police officer's

story, and consider whether this evidence could convince a rational factfinder that

the officer acted unreasonably." <u>Id.</u>; <u>see also</u> <u>George v. Morris</u>, 736 F.3d 829 (9th

Cir. 2013) ("In cases where the best (and usually only) witness who could offer

direct testimony for the plaintiff about what happened before a shooting has died,

our precedent permits the decedent's version of events to be constructed

circumstantially from competent expert and physical evidence, as well as from

inconsistencies in the testimony of law enforcement."); <u>Maravilla v. United States</u>,

60 F.3d 1230, 1233-34 (7th Cir. 1995) (where "the witness most likely to contradict the officers' testimony is dead," the court should "examine all the evidence to determine whether the officers' story is consistent with other known facts").

B.    Discussion

The Court's analysis of the use of force falls into three categories of distinct conduct: the officers' initial use of less-than-lethal force (forceful use of the shield, Tasers, Sage guns), initial use of lethal force (live ammunition) by Sgt. Flores and Det. Morrissey, and the final use of lethal force by Sgt. Flores.  With the exclusion of Dr. Sullivan, plaintiffs have proffered no evidence that the defendant police officers are not entitled to qualified immunity with respect to the first two categories of conduct.  Given that the Court must draw all inferences to the plaintiffs on summary judgment, though, it must deny Sgt. Flores qualified immunity as to the third category of conduct.

The Court renders its decision cognizant of the unusual circumstance of parsing individual moments so finely as to both grant and deny qualified immunity in connection with a single complex event.  In sum, reasonable jurors applying their common sense could determine that it was objectively unreasonable to shoot Mr. Jaquez in the back of the head when he had already been shot at least four times, was surrounded by a team of officers suited up in their ballistics gear, and, even if he somehow maintained possession of the knife, was merely pushing up from the ground.  Reasonable jurors could determine that as to that moment, the officers could have merely backed off or taken some form of alternative action.

1.     The Use of Less-Than-Lethal Force

Officers Henderson, McNamee, Flood, Flores and Morrissey are all entitled to qualified immunity regarding the use of less-than-lethal force (including the use of the shield, Tasers, and Sage guns) because their use of force here was objectively reasonable under the standard described supra.  To the extent that plaintiffs argue that any use of a Taser or Sage gun is inappropriate, there is no precedent saying so.  In fact, the Second Circuit has held that an officer's decision to use a Taser in order "to subdue an actively non-compliant suspect . . . who posed a real and imminent threat to the safety of the officers and [] bystanders," was reasonable when repeated, clear instructions were given to the suspect to return to the ground. See Macleod v. Town of Brattleboro, 548 Fed. Appx. 6, at *8 (2d Cir. 2013).  To the extent that plaintiffs argue the particular circumstances here prohibited the use of a Taser or Sage gun, they fail to provide direct or circumstantial evidence to discredit the officers' testimony – namely, that they used the non-lethal force in response to Mr. Jaquez threatening them with a knife.  For example, Det. Henderson initially used his Taser on Mr. Jaquez because he was approaching the officers, Det. Henderson could not see his hands, Mr. Jaquez refused to comply with the officers' instructions to show them his hands, and Det. Henderson had seen, just a short time before, that he had a knife in his hand. (56.1 Statement ¶¶ 59, 6l-65). The events took place in a confined space and Mr. Jaquez was not on the ground. Qualified immunity thus applies as reasonable officers could differ on whether this

particular use of non-lethal force was appropriate given the exigency of the situation.[10]

As Det. Henderson, Det. McNamee, and Det. Flood were only involved in the use of non-lethal force, they are hereby dismissed from this case.

### 2. The Initial Use of Lethal Force by Sgt. Flores and Det. Morrissey

The officers have testified that Det. Morrissey and Sgt. Flores each shot several rounds of live ammunition at Mr. Jaquez while Mr. Jaquez and Det. McNamee were engaged in a serious struggle during which Mr. Jaquez aggressively wielded his knife.[11]  Plaintiffs dispute that Mr. Jaquez threatened Det. McNamee with the knife.  The situation was chaotic and escalated quickly.  Reasonable people might disagree as to whether any use of lethal force was necessary to subdue Mr. Jaquez.  But the law is clear that immunity is appropriate precisely when reasonable people can disagree, and that in all events second-guessing is not appropriate.  See Salim, 93 F.3d at 91 ("The Supreme Court has made it clear that an officer's actions are not to be assessed with 20/20 hindsight.").  The standard is whether "officers of reasonable competence could disagree" on the legality of Det.

---

[10] Plaintiffs concede that as of the date of the incident (April 12, 2009), there was no pre-existing Second Circuit and Supreme Court case law involving an allegation of excessive force based on the use of a Taser or Sage gun.  (Pl.'s Br. at 15-16.)  The ultimate question here, however, is not whether the use of a Taser is in and of itself lawful in an appropriate situation, but whether its use here, under the circumstances before the Court, was objectively reasonable.

[11] Only Det. Morrissey and Sgt. Flores fired live ammunition.  The other defendants (Det. Flood, Det. Henderson, Det. McNamee) are entitled to qualified immunity as to the use of lethal force because there is no indication that they had a moment to intervene, given the quick succession of events.  See Thomas v. Roach, 165 F.3d 137, 146 n.3 (2d Cir. 1999) (noting that police officers have a duty to prevent other officers in their presence from using excessive force); Rasanen v. Brown, 603 F. Supp. 2d 550, 553-54 (E.D.N.Y. 2009) ("Under Section 1983, a police officer is personally involved in the use of excessive force only if he either directly participates in the conduct giving rise to the claim or was present and yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so.").

Morrissey and Sgt. Flores's actions at the time.  See Malley, 475 U.S. at 341; see also Scott, 39 F.3d at 915 ("as the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them." (citing Illinois v. Lafayette, 462 U.S. 640, 647 (1983))).  Given that plaintiffs have not put forward evidence creating a triable issue on whether Mr. Jaquez was engaged in a struggle with Det. McNamee while wielding a knife, officers of reasonable competence could disagree on the legality – and the reasonableness – of the initial use of firearms.  See id.; see also Brownell v. Figel, 950 F.2d 1285, 1292-93 (7th Cir. 1991) ("[I]n the absence of any evidence of specific wrongdoing, [plaintiff's] excessive force claim is speculative and fails to raise any material issue of fact for trial.").

Plaintiffs rely on speculation.  Without expert testimony to explain why the officers' testimonies is contradicted by physical evidence or the autopsy report, plaintiffs are only left with speculation that Mr. Jaquez would have likely dropped the knife after being hit with the Sage gun, minor differences between the testimony of the officers, and the fact of the downward trajectory of the bullets.  In the context of a qualified immunity defense to a § 1983 retaliation claim, the Supreme Court found that "if the defendant-official has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford–El v. Britton, 523 U.S. 574, 600

(1998) (citing <u>Anderson</u>, 477 U.S. at 256-57); <u>see also</u> <u>Deters v. Lafuente</u>, 368 F.3d 185, 190 (2d Cir. 2004) (reversing the denial of summary judgment to defendants on the basis of qualified immunity where "plaintiffs have offered no facts supporting a retaliatory motive on the part of [defendant]. Instead, they engage in wide-ranging speculation about what may have motivated him to act as he did with respect to plaintiffs."); <u>Tom v. Voida</u>, 963 F.2d 952, 961 (7th Cir. 1992) ("To the extent that there are minor ambiguities in [defendant's] statements, these ambiguities do not relieve the plaintiff of the burden of presenting affirmative evidence to support her case.").

The Eastern District of New York similarly granted defendants' motion for summary judgment on a § 1983 excessive force claim where plaintiff did little more than question the reasonableness of the officer's use of hollow point bullets, question why the plaintiff was shot three times, and "attempt[] to establish that the record submitted by the defendants is so riddled with inconsistencies that a denial of summary judgment is warranted."  <u>Chandie v. Whelan</u>, 21 F. Supp. 2d 170, 176 n. 4 (E.D.N.Y. 1998) ("'[M]otions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts may some day reveal.'" (quoting <u>Roche v. John Hancock Mutual Life Ins. Co.</u>, 81 F.3d 249, 253 (1st Cir. 1996))).  Similarly, in an unpublished Seventh Circuit disposition, <u>Reed v. Town of North Judson, Inc.</u>, 996 F.2d 1219 (7th Cir. 1993), an officer testified that he shot the decedent from his position inside a car after he was unable to escape from the decedent who was attacking him with a tire jack.  The Seventh Circuit

affirmed summary judgment for the officer because Appellant failed to submit any affirmative evidence contradicting the officer's testimony. The Court said that the mere fact of the bullet's downward trajectory does not create a dispute of material fact as "[m]any explanations could exist as to the downward trajectory of the bullet." Id. at *5.

Here, speculation about whether Mr. Jaquez dropped the knife is just that – speculation. There is nothing in the autopsy report or testimony to show that it has any basis in truth. Pointing out minor inconsistencies in the officers' testimony does not negate that each percipient witness says Mr. Jaquez threatened Det. McNamee with a knife immediately prior to being shot. Reliance on the "downward trajectory" of the bullets also does not eliminate the officers' unrebutted assertion that Mr. Jaquez physically threatened Det. McNamee with a knife. Plaintiffs have failed to proffer admissible evidence in support of their assertions that reasonable officers would agree that it was unreasonable to use live ammunition in such circumstances.

Plaintiffs also assert that the actions of the police officers exacerbated Mr. Jaquez's outbursts and created a situation in which force was necessary. The Second Circuit has found irrelevant whether an officer "created a situation in which the use of deadly force became necessary". See Salim, 93 F.3d at 92 (any violations of police procedure and failure to disengage when other children entered the fray were "irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force"); see also Schulz v. Long, 44 F.3d 643, 649 (8th Cir.

1995) ("[E]vidence that [the officers] created the need to use [deadly] force by their actions prior to the moment of seizure is irrelevant . . ."); <u>Fraire v. City of Arlington</u>, 957 F.2d 1268, 1275-76 (5th Cir. 1992), <u>cert. denied</u>, 506 U.S. 973 (1992) (same).

Accordingly, Det. Morrissey is dismissed from this case, and Sgt. Flores is granted qualified immunity on this initial use of firearms.

3.    <u>The Final Use of Live Ammunition by Sgt. Flores</u>

There is no dispute of fact that Mr. Jaquez was on the ground after being hit at least four times with live ammunition fired by Sgt. Flores and Det. Morrissey. (<u>See</u> 56.1 Statement ¶ 113; Ex. 4 (Landi Autopsy Report).)  There is also no dispute of fact that Sgt. Flores fired one final bullet into the back of Mr. Jaquez's head shortly thereafter.  (<u>Id</u>. ¶¶ 1.12, 115.)  The question for the Court is whether, since plaintiffs have failed to proffer any additional expert or other evidence, the existing circumstantial evidence alone raises a triable issue as to whether Mr. Jaquez threatened the officers with death or serious bodily injury just prior to the moment that the final bullet was fired.  The Court finds it quite a close call, but ultimately that it does.

The dispositive legal point is that a grant of qualified immunity as to the use of force – even lethal force – in the course of an event does not necessarily extend to all use of such force throughout the incident.  While it may have been reasonable for Sgt. Flores to use lethal force earlier in the altercation when Mr. Jaquez threatened the officers with a knife, such authority does not extend indefinitely.  <u>See</u> <u>O'Bert</u>, 331 F.3d at 40 ("The earlier threat [with a knife] did not give [the officer] license to

39

shoot to kill a man he knew, immediately before and at the moment of the shooting, was unarmed.").

Here, plaintiffs cannot present evidence disputing the officers' testimony that Sgt. Flores fired the final bullet while Mr. Jaquez, who was severely wounded and on the ground, began pushing up towards Det. McNamee with the knife still in his right hand.  Defendants argue that reasonable officers could disagree as to whether the use of that final shot was proper in such a chaotic situation.  However, there are a number of facts that, when taken together and viewed in the light most favorable to plaintiffs as they must be, create a triable issue on the propriety of firing the final shot.  Even without the expert testimony of Dr. Sullivan, a rationale juror could draw factual inferences to determine that Sgt. Flores' use of lethal force was unreasonable where Mr. Jaquez had already been severely wounded, was on the ground, and was surrounded by a team of officers protected by ballistics gear.  See id. at 36 (at summary judgment where the person most likely to contradict the police officer's story is the unavailable decedent, the Court "must also consider 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.'" (quoting Scott, 39 F.3d at 915)).

Summary judgment is inappropriate with regard to an excessive force claim when material facts are in dispute. See Kerman v. City of New York, 261 F.3d 229, 239-40 (2d Cir. 2001) (jury should decide whether force used was excessive and whether defendant was entitled to qualified immunity where there were disputed

40

factual issues as to defendant's conduct following the initial seizure and handcuffing); Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999) (reversing grant of qualified immunity on excessive force claim where facts were disputed).

In a § 1983 excessive force case involving a fatal police shooting, Samples v. Atlanta, 846 F.2d 1328 (11th Cir. 1988), a police officer was the only witness to his shooting a sixteen-year-old suspect twice in the chest, twice in the left side, and once in the back.  The officer testified that the suspect pulled out a pocket knife and began to open it while moving closer to the officer.  The Eleventh Circuit reversed summary judgment for the defendants because evidence existed from which a fact finder could conclude that the officer's use of force was unreasonable.  Id. at 1332-33.  The court listed evidence creating an issue of material fact including the unopened pocket knife, the small size of the knife (three inches), the fact that the officer weighed nearly 100 pounds more than the 128 lb. suspect, and entry of one of the bullets in the suspect's back.  Id. at 1332.  Here, too, a juror could apply his or her common sense to the facts.

In another § 1983 excessive force case involving a fatal police shooting, the Fifth Circuit found plaintiffs' claims insufficient where they "rest the majority of their argument on the short time frame covering the events in question, the location of [decedent's] boots, and the position of [decedent's] body when he was shot." Ontiveros v. City of Rosenberg, Tex., 564 F.3d 379, 383 (5th Cir. 2009).  The Fifth Circuit found that these facts were not disputed by defendants and did not contradict the police officer's testimony.  "Instead, Appellants are attempting to use

these undisputed facts to imply a speculative scenario that has no factual support."
Id.  "Notably, Appellants provide no evidence to support their skepticism, and 'at
the summary judgment stage, we require evidence—not absolute proof, but not
mere allegations either.'" Id. at 383 (internal citation omitted).

In a similar § 1983 excessive force case involving a fatal police shooting of a
burglary suspect, the First Circuit also found that plaintiff was "unable to put forth
competent evidence to dispute" the record showing that the police officers shot at
the decedent only after he accelerated his car towards them.  McGrath v. Tavares,
757 F.3d 20, 26 (1st Cir. 2014), cert. denied, 135 S. Ct. 1183 (2015).  Plaintiff
pointed to police photographs of the resulting bullet holes in passenger side of the
vehicle in an attempt to demonstrate that the officers were never in front of the
accelerating car.  "But without expert testimony on the trajectory of a bullet, these
photographs are not enough to show where an officer was standing when he fired
his gun." Id. at 27.

Here, too, plaintiffs' pointing to an autopsy report is not enough to show
precisely where Sgt. Flores was standing when he shot his firearm at Mr. Jaquez.
But, unlike the other cases, there is credible evidence creating a triable issue of fact.
While plaintiffs cannot credibly reconstruct the scene, they can point to deposition
testimony from Sgt. Flores wherein he agreed that Mr. Jaquez was not threatening
anyone with the knife while pushing up from the ground.  (56.1 Statement. ¶¶ 115,
115.2, Ex. M (Flores Depo.), 107:18-108:06.)  A reasonable juror could also use
circumstantial evidence of the downward trajectory of the bullet in the back of Mr.

42

Jaquez's head combined with testimony that Mr. Jaquez was in a "push-up position" at the time of the final shot (id.) combined with autopsy evidence that he had been shot at least four times already to determine that he could not have been a threat to the officers.  If Mr. Jaquez was not a threat, Sgt. Flores' use of lethal force was improper.

Accordingly, there is a triable issue as to whether Sgt. Flores is entitled to qualified immunity on the excessive force claim pertaining to the final use of force.

### 4.   State Law Cause of Action for Assault and Battery

Plaintiffs have also asserted two state law causes of action against each of the officers: assault and battery, and wrongful death.

Officers Henderson, McNamee, Flood and Morrissey are entitled to summary judgment with respect to the state law assault and battery claim for the same reason they are entitled to immunity with respect to the § 1983 excessive force claim.  See Mesa v. City of New York, No. 09–CV–10464 (JPO), 2013 WL 31002, at *27 (S.D.N.Y. Jan. 3, 2013) ("Since 'New York law regarding assault and battery generally parallels federal law regarding excessive force,' . . . where the force employed by an officer is objectively reasonable, a claim for assault and battery against that same officer will not lie." (quoting Gomez v. City of New York, No. 05 Civ. 2147, 2007 WL 5210469, at *11 (S.D.N.Y. May 28, 2007))); Biggs v. City of New York, No. 08 Civ. 8123 (PGG), 2010 WL 4628360, at *8 (S.D.N.Y. Nov. 16, 2010) ("Defendants are entitled to summary judgment on [plaintiff's] assault and battery claims for the same reason that [plaintiff's] excessive force claim was dismissed:

[The officer's] use of deadly force was objectively reasonable under the circumstances."); Kramer v. City of New York, No. 04–CV–106 (HB), 2004 WL 2429811, at *11 (S.D.N.Y. Nov. 1, 2004) ("In the context of state officers performing their lawful duties, New York State law regarding assault and battery parallels the federal laws regarding excessive force.").

Correspondingly, the motion for summary judgment on the assault and battery claim is denied as to Sgt. Flores.  See Pierre–Antoine v. City of New York, 04 Civ. 6987 (GEL), 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006) ("Because there is a genuine issue of material fact as to whether [the officer] used excessive force against [the plaintiff], there is likewise a genuine issue of material fact as to whether [the officer] committed assault against [the plaintiff], and the motion for summary judgment is thus denied with respect to the assault claim."); Hogan v. Franco, 896 F. Supp. 1313, 1315 n. 2 (N.D.N.Y. 1995) ("The test for whether a plaintiff can maintain a supplemental cause of action for assault and battery is the exact same test as the one used to analyze a Fourth Amendment excessive force claim.")

    5.    State Law Cause of Action for Wrongful Death

Plaintiff's final cause of action is a claim for wrongful death.  "Under New York law, to recover damages for wrongful death, a plaintiff must prove: (1) the death of a human being; (2) a 'wrongful act, neglect or default of the defendant' that caused the decedent's death; (3) the survival of distributees who suffered pecuniary loss by reason of the decedent's death; and (4) the appointment of a personal

representative of the decedent." <u>Pub. Adm'r of Queens County ex rel. Estate &</u>
<u>Beneficiaries of Guzman v. City of New York</u>, No. 06 Civ. 7099, 2009 WL 498976, at
*5 (S.D.N.Y. Feb. 24, 2009) (citing <u>Chong v. New York City Transit Auth.</u>, 83 A.D.2d
546, 441 N.Y.S.2d 24, 25-26 (2d Dep't 1981)).  Defendants argue that the wrongful
death claim is derivative of the other state law claims arising from Mr. Jaquez's
death.  (Br. at 22-23, ECF No. 112.)  Plaintiffs, in response, "agree with the
defendants that the wrongful death claim derives from the defendants' commission
of assault and battery of the plaintiff"; their only disagreement is that the wrongful
death claim therefore goes to trial because the assault and battery claim should go
to trial.  (Br. 19, ECF No. 119.)

 As the state law assault and battery claim has no merit as to Officers
Henderson, McNamee, Flood and Morrissey, plaintiff is unable to show a triable
issue on the second prong of a "wrongful act, neglect or default" and the wrongful
death claim must therefore be dismissed as to those officers.  <u>See, e.g.</u>, <u>Tuosto v.</u>
<u>Philip Morris USA Inc.</u>, 672 F. Supp. 2d 350, 367 (S.D.N.Y. 2009) (dismissing
plaintiff's wrongful death claim where each of plaintiff's other claims were
dismissed); <u>Hollman v. County of Suffolk</u>, No. 06-cv-3589 (JFB), 2011 WL 2446428,
at *12 (E.D.N.Y. June 15, 2011) ("The negligence determination is also
determinative of the plaintiff's wrongful death claim" because it was necessary in
order to find "the defendant's wrongful act, neglect, or default caused the decedent's
death."); <u>Cerbelli v. City of New York</u>, 600 F. Supp. 2d 405, 429 (E.D.N.Y. 2008)
(granting summary judgment for the defendant on the wrongful death claim

because plaintiff could not sustain a negligence or malpractice cause of action and "therefore cannot prove the second element of a wrongful death claim"). Correspondingly, defendants' motion for summary judgment on the wrongful death claim is denied as to Sgt. Flores.

V.    CONCLUSION

Defendants' motion to preclude the expert testimony of Dr. Sullivan is GRANTED.  Its renewed motion for summary judgment is thereby GRANTED with respect to all claims against Officers Henderson, McNamee, Flood and Morrissey.  It is GRANTED IN PART and DENIED IN PART with respect to Sgt. Flores: it is GRANTED with respect to claims based on the use of non-lethal force and the use of lethal force preceding the final bullet, and DENIED with respect to the final use of lethal force.  The motions in limine (ECF Nos. 149, 150, 159) are denied as moot with leave to refile in amended form in connection with the trial, reflecting the above rulings.

The parties shall confer on a near-in trial date and, within seven days of this Order, provide the Court with various alternatives.

The Clerk of Court is directed to close the motions at ECF Nos. 149, 150, and 159.


SO ORDERED.

Dated:      New York, New York
            May 8, 2015

_____
            KATHERINE B. FORREST
            United States District Judge