```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 17, 2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

THE ESTATE OF MAURICIO JAQUEZ,　　:
*by The Public Administrator of Bronx*　:
*County as administrator of the Good,*　:
*Chattels and Credit of the deceased*　:
*Mauricio Jaquez*, and ANA MARTINEZ,　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Plaintiffs,　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　-v-　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
SERGEANT WILLIAM FLORES, Shield　:
No. 1023,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Defendant.　　　:

-------------------------------------------------------X

10 Civ. 2881 (KBF)

OPINION & ORDER
ON MOTIONS IN
LIMINE AND
PRETRIAL MATTERS
#1

KATHERINE B. FORREST, District Judge:

　　　Trial in this matter will begin on Monday, April 4, 2016.  In accordance with
the Court's individual rules, the parties have submitted a Joint Pretrial Order
("JPTO") and filed a number (specifically, twenty) motions in limine.  (ECF Nos. 204
& 207.)

　　　The Court has divided its decisions on these matters into two opinions: the
instant opinion (entitled Opinion & Order on Motions In Limine and Pretrial
Matters #1) and a companion opinion released simultaneously (#2).  This opinion
focuses on matters that arise directly from disagreements the parties identified in
the JPTO and from additional briefing the Court thereafter requested.  Specifically,
the Court requested that each party specifically address three topics: (1) the
ambiguity, if any, as to whether the final shot may have been the fatal wound; (2)
the admissibility of autopsy photos of the decedent; and (3) whether the jury should

be instructed on both state and federal charges.  (ECF No. 203.)  The parties have provided their responses in their motions in limine and in additional pretrial briefing the Court requested.  (ECF Nos. 204-07, 213-14, 216-17.)

The Court assumes the reader's familiarity with the facts of this matter, which have been documented in earlier decisions.  (See, e.g., ECF Nos. 84, 128, 157, 169, and 186.)  This trial follows an extensive litigation history which has narrowed the triable issues of fact.  Nonetheless, the parties' submissions in advance of trial indicate a deep disagreement about the scope of this trial as to both liability and damages.  It is therefore appropriate at this pretrial stage for the Court to address what questions do and do not properly remain for the jury, rather than requiring lengthy argument and inevitable interruption during the trial itself over its fundamental nature.

This trial will determine whether Sgt. Flores is liable for the final shot that struck Mr. Jaquez, and if so, what damages are appropriate.  As discussed below, the circumstances leading up to and surrounding that moment are inescapably part of the story.  But the trial must and will be focused on the final shot and damages proximately caused by that shot.  This scope dictates certain rulings on the appropriate presentation of the parties' cases, the admissibility of certain evidence, and the instructions to the jury.

Motions in limine exist "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the

trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (quoting Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc., 652 F. Supp. 1400, 1401 (D. Md. 1987)).  It is with the goal of insuring that trial in this matter is both fair and efficient that the Court makes the following determinations.

A.     Which Was The Final Shot?

On May 8, 2015, the Court granted summary judgment as to all defendants other than Sgt. Flores, and as to Sgt. Flores with respect to claims based on the use of non-lethal force and the use of lethal force preceding the final bullet, but not with respect to claims based on the final use of lethal force.  (ECF No. 169 at 46.)  It is against this backdrop that this matter proceeds to trial on that final shot.

Unexpectedly, at this late stage there is dispute over a question the Court thought long-settled: whether there is any evidence from which a jury could conclude that the final shot, the only one at issue in this trial, is the shot that caused what is known as wound F and therefore caused damage to Mr. Jaquez's internal organs and ultimately death.  Defendants submit that the evidence is unambiguous and could not lead a rational jury to find that this is the case.  (ECF No. 213.)  Plaintiffs disagree, and argue that there is ample evidence from which the jury could conclude that the final shot was the one to the torso which caused extensive damage to the internal organs and was fatal.  (ECF No. 214.)

The evidence in this case, the Court's rulings, and indeed plaintiffs' own binding positions to date all lead to the conclusion that the final shot was not to the

torso.  Instead, the final shot struck Mr. Jaquez behind his right ear.  This question was put beyond dispute long ago.

Mr. Jaquez's autopsy identified six[1] gunshot wounds to his body.  (ECF No. 117, Exh. 4.)  The autopsy report labeled these wounds A through F.  Shot A entered Mr. Jaquez's body behind the right ear, traveled "directly downward, slightly right to left" through the muscle of his neck, fractured part of his cervical spine, and lodged itself on the right side of his thoracic spine.  (Id. at 4.)  Shot F entered Mr. Jaquez's body through the right side chest wall, traveled "right to left, downward and back to front," broke one of Mr. Jaquez's right ribs, substantially perforated his diaphragm, liver, right kidney, and aorta, and lodged itself in the soft tissue adjacent to his spine.  (Id. at 6.)

Dr. Kristen Landi, the medical examiner at the Office of the Chief Medical Examiner for the City of New York who performed Mr. Jaquez's autopsy, has testified that the bullet that caused wound A made only a "negligible" contribution to Mr. Jaquez's death (ECF No. 117, Exh. 1, 36:19-25), while the bullet that caused wound F "caused significant damage" and "significant internal bleeding."  (Id., 71:12, 72:18.)  The evidence of which the Court is aware indicates that wound F was the mortal wound, and that damages flowing from the fact of Mr. Jaquez's death are most closely associated with this wound.

The parties' present disagreement is whether the evidence is unambiguous that the final shot caused wound A, or whether the jury might properly conclude

---

[1] Two of these wounds may have been caused by a single bullet.

that it caused wound F.  Defendants support their position by arguing that wound A is the only track with a significantly distinct horizontal component and the only shot that did not hit Mr. Jaquez in the torso.  (ECF No. 213 at 3.)  Plaintiffs point to the fact that no witness has admitted to knowing where any of the particular shots hit Mr. Jaquez and argue that the officers' described positions at the time of the final shot could be consistent with it causing wound F.  (ECF No. 214 at 2-4.)

Although the Court generally agrees with defendants' description of the evidence, its determination that the final shot unambiguously caused wound A is based on an independent and more important factor: plaintiffs' own consistent (until now) description of the evidence.

Plaintiffs have long litigated this case on the position that Mr. Jaquez incurred wound F during the initial sequence of shots and wound A from Sgt. Flores's final shot.  For example, plaintiffs' opposition to defendants' motion for summary judgment parsed in particular whether "the final shot fired by Sgt. Flores was a reasonable use of force."  (ECF No. 119 at 14.)  In arguing that it was not, plaintiffs detailed that the shot "enter[ed] just behind Mr. Jaquez's right ear and proceed[ed] directly downward along his spine, indicating he had been shot from directly above."  (Id.)  Plaintiffs supported this proposition by citing paragraphs 1.12-1.14 of plaintiffs' response to defendants' Rule 56.1 statement, all of which described only bullet track A.  (Id.; ECF No. 118 at ¶¶ 1.12-1.14.)

Plaintiffs' opposition to defendants' motion for summary judgment also relied on the testimony of proposed expert Dr. Richard Sullivan.[2]  Plaintiffs argued that the force of the final shot was unreasonable because "it would have been virtually impossible for Mr. Jaquez to push himself up and pose a threat at that point given the multiple wounds to his internal organs and right arm."  (ECF No. 119 at 14.) This argument relied on Dr. Sullivan's opinion that wound F "would have been devastating" and "completely incapacitate[ing]," and therefore that Mr. Jaquez "posed no conceivable threat to anyone after Wound F was inflicted."  (ECF No. 117, Exh. 21, at 5.)  Plaintiffs were unambiguously relying on the proposition that the final shot did not cause wound F, but instead wound A.

In its opinion granting in part and denying in part defendants' motion for summary judgment, the Court adopted the view plaintiffs had advanced.  The opinion directly states that "[t]he final shot by Sgt. Flores … entered the back of Mr. Jaquez's head."  (ECF No. 169 at 2.)  The Court described the final bullet using quotations from plaintiff's Rule 56.1 statements about track A.  (Id. at 11.)  And in determining that Sgt. Flores was not entitled to qualified immunity for the final shot, the Court emphasized that there was "no dispute of fact that Sgt. Flores fired one final bullet into the back of Mr. Jaquez's head."  (Id. at 39.)

Although plaintiffs moved the Court to reconsider its summary judgment opinion, they did not object to the Court's adoption of their theory of the last bullet.

---

[2] The Court has precluded Dr. Sullivan's expert testimony under Daubert v. Merrell Dow Pharms., Inc., 409 U.S. 579 (1993) and related case law.  (ECF No. 157.)  After this preclusion, and after the close of discovery, the Court provided plaintiffs with the opportunity to call a new expert.  (ECF No. 189.)  Plaintiffs made the tactical decision not to do so.  (ECF No. 190.)

Plaintiffs' reply brief in support of their motion for reconsideration argued that "<u>one of the first three bullets fired by Sgt. Flores</u> passed through Mr. Jaquez's upper right arm down into the right side of his torso, damaging his rib, diaphragm, kidney, liver and aorta."  (ECF No. 180 at 4 (emphasis added).)  Plaintiffs supported this proposition by citing paragraphs 1.25-1.34 of plaintiffs' response to defendants' Rule 56.1 statement, all of which described only bullet tracks E and F.  (<u>Id.</u>; ECF No. 118 at ¶¶ 1.25-1.34.)  Similarly, in opposing defendants' motion for reconsideration, plaintiffs asserted that "there is no dispute that the last shot was fired from Sgt. Flores's gun, entered Mr. Jaquez's neck and proceeded down his spine injuring the muscle and bone along the way."  (ECF No. 181 at 16.)

Even as late as the JPTO, plaintiffs have seemingly recognized that the issue for the jury on the excessive force claim is "the final shot to Mr. Jaquez's head fired by Sergeant Flores."  (JPTO, Exh. C, at 32 n.34.)

The doctrine of judicial estoppel addresses circumstances precisely like the one now before the Court.  "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  <u>DeRosa v. Nat'l Envelope Corp.</u>, 595 F.3d 99, 103 (2d Cir. 2010) (quoting <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001)).  "Typically, judicial estoppel will apply if: 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in

the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." Id.  All of these conditions are met here: plaintiffs have previously argued that wound F was inflicted in the initial fusillade and wound A was attributable to the final shot; the Court has explicitly adopted that view; and plaintiffs would derive an unfair advantage if they were permitted to argue that wound F was both the incapacitating earlier shot that made the final shot unreasonable and the final shot itself.

The final shot at issue in this trial caused wound A, and the parties should plan their proof accordingly.

B.     The Wrongful Death Claim

One of the causes of action plaintiffs alleged in their Third Amended Complaint was a wrongful death claim under New York Estates and Public Trust Law ("EPTL") § 5-4.1.  (ECF No. 72 at 15-16.)  In the Court's earlier order granting Sgt. Flores qualified immunity as to all actions except for the final shot, the Court explicitly denied the motion for summary judgment on the wrongful death claim as to Sgt. Flores.  (ECF No. 169 at 45-46.)  As discussed below, based on the Court's further review of the record, the Court invites what is essentially a renewed application on this question.  In the current briefing, the parties have not yet squarely addressed whether there is a triable issue on a wrongful death claim as to the last shot, although defendants have intimated in a footnote to their motion in limine that they will move to exclude wrongful death damages.  (ECF No. 206 at 27 n.6.)

If there is a finding of liability, the compensatory damages recoverable in this case will be only those proximately caused by bullet track A.  Under New York law, "[t]o succeed on a cause of action to recover damages for wrongful death, the decedent's personal representative must establish, inter alia, that the defendant's wrongful act, neglect or default caused the decedent's death." Roth v. Zelig, 883 N.Y.S.2d 550, 559 (App. Div. 2009) (emphasis added) (quoting Eberts v. Makarczuk, 861 N.Y.S.2d 731, 732 (App. Div. 2008)).   New York law directs that a wrongful death claim will only go to a jury if there is "sufficient evidence from which a jury could rationally conclude that [defendants' actions] were a substantial factor in causing the death of the decedent." Marus v. Vil. Med., 858 N.Y.S.2d 735, 737 (App. Div. 2008).  Thus, whether the jury will be instructed on wrongful death depends on whether there is evidence from which a rational jury might conclude that wound A proximately caused, or at least was a substantial factor in, Mr. Jaquez's death.

The Court is, at this time, aware of no medical evidence that this wound was fatal or substantially contributed to Mr. Jaquez's death.  The medical evidence of which the Court is aware is from Dr. Landi, who stated that wound F caused major damage and was fatal while wound A made a "negligible contribution" to Mr. Jaquez's death.  Therefore, the Court now invites a very short motion by defendants for summary judgment on this claim, which shall be filed not later than **Monday, March 21, 2016**.  Plaintiffs' opposition shall be filed not later than **Thursday, March 24, 2016**.  For this claim to survive, plaintiffs must proffer evidence from which the jury could conclude that the final shot was "a substantial factor

9

precipitating decedent's death." <u>Nastasi v. State</u>, 389 N.Y.S.2d 175, 176 (App. Div.

1976).  Absent such a proffer, this claim cannot go forward.

The causal connection between the final shot and Mr. Jaquez's death is

important to two aspects of this case: the availability of a wrongful death claim and

the damages appropriate under the § 1983 excessive force claim.  As discussed

above, an act must be at a minimum a substantial factor in causing a death to occur

in order to give rise to wrongful death liability under New York law.

The availability of different categories of damages flowing from the fact of

Mr. Jaquez's death depends on the theory of liability.  In New York, wrongful death

actions are a creature of statute, and as a result "wrongful death damages are

limited to fair compensation for the pecuniary injuries resulting from the decedent's

death to the persons for whose benefit the action is brought." <u>McKee v. Colt Elecs.

Co.</u>, 849 F.2d 46, 50 (2d Cir. 1988).  The statute does not permit recovery for grief or

other loss of society and companionship.  <u>Id.</u> (quoting <u>Liff v. Schildkrout</u>, 404 N.E.2d

1288, 1292 (N.Y. 1980)).  Children can, however, "recover for the pecuniary loss

suffered as a result of the lost nurture, care, and guidance they would have received

if the parent had lived," <u>id.</u>, although a wrongful death claim is subject to dismissal

if the plaintiff "fail[s] to provide furnish any evidence establishing pecuniary loss as

a result of [the decedent's] death." <u>Pub. Adm'r of Queens Cnty. ex rel. Estate &

Beneficiaries of Guzman v. City of New York</u>, No. 06 Civ. 7099, 2009 WL 498976, at

*5 (S.D.N.Y. Feb. 24, 2009).

In contrast, the same limitations on certain types of damages are not applicable to § 1983 excessive force claims in which death resulted.  Although the type of damages available in a New York wrongful death claim are strictly limited to pecuniary losses, "limitations in a state survival statute have no application to a section 1983 suit brought to redress a denial of rights that caused the decedent's death." McFadden v. Sanchez, 710 F.2d 907, 911 (2d Cir. 1983).  "Uniformly, the courts have ruled that when a violation of federal rights protected by § 1983 does cause the decedent's death, state laws that either extinguish the survival action or bar recovery for loss of life, effectively abate a § 1983 claim of deprivation of life, are inconsistent with § 1983, and warrant application of a federal rule of decision pursuant to § 1988." Banks ex rel. Banks v. Yokemick, 177 F. Supp. 2d 239, 250 (S.D.N.Y. 2001).  "The right to enjoyment of life without its unlawful curtailment has an intrinsic worth that necessarily exceeds the dollars-and-cents value of the decedent to his beneficiaries." Id. at 249.

Section "1983 itself contains no provision defining specific elements of recoverable damages." Banks ex rel. Banks v. Yokemick, 177 F. Supp. 2d 239, 247 (S.D.N.Y. 2001).  Nevertheless, it has been long established that "[t]he 'basic purpose' of § 1983 damages is 'to compensate persons for injuries that are caused by the deprivation of constitutional rights.'" Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999) (quoting Carey v. Piphus, 435 U.S. 247, 253-54 (1978)).  "The type and amount of such damages 'is ordinarily determined according to principles

derived from the common law of torts.'" Id. at 147-48 (quoting Memphis Cmty. Sch.

Dist. v. Stachura, 477 U.S. 299, 306 (1986)).

The main principle from the common law of torts that serves to define and

limit compensatory damages in § 1983 claims is the doctrine of proximate causation.

See, e.g., id. at 146.  "To recover compensatory damages under Section 1983, a

plaintiff must prove that his injuries were proximately caused by a constitutional

violation."  Gibeau v. Nellis, 18 F.3d 107, 110 (2d Cir. 1994).  In this case, the only

potential constitutional violation was the final shot.  Therefore, there must be

competent evidence from which a rational jury could infer that the final shot

proximately caused Mr. Jaquez's death in order to establish the relevance of any

evidence of damages that flowed from that death.  Plaintiffs must proffer such

evidence in advance of trial in order to properly establish the scope of the claims

and damages properly at issue.

C.    The Relevance of the Prior Shots

As discussed above, at this stage the issues in this case are whether the final

shot Sgt. Flores fired was an appropriate use of force[3] and, if not, what damages are

appropriate.  Whether the use of deadly force was appropriate or actionable will

depend on whether, under the totality of the circumstances, Sgt. Flores had

"probable cause to believe that the suspect pose[d] a significant threat of death or

serious physical injury to the officer or others" and whether "'on an objective basis,

it is obvious that no reasonably competent officer would have concluded' in that

---

[3] The answer to this question will turn on both the merits of plaintiffs' excessive force claim and Sgt. Flores's entitlement to qualified immunity.

moment that his use of deadly force was necessary." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) (citation omitted) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The "totality of the circumstances" the jury will be called to evaluate include Mr. Jaquez's condition at the time of the final shot, and what Sgt. Flores and/or a reasonably competent officer would have concluded about his physical capabilities. The altercation between Mr. Jaquez and the officers is relevant background to the final moments, during which defendants argue that he was pushing up from the floor with a knife in his hand and plaintiffs argue that he was not and was physically incapable of doing so. The jury will need to hear about the events prior to the final shot, but only to the extent necessary to evaluate this issue. The Court cautions the parties that they should use the prior shots as background, but the bulk of time at trial shall not be spent on the prior shots except to the extent necessary to achieve that goal. The Court is concerned that plaintiffs intend to present voluminous evidence ultimately only tangentially related to the ultimate questions at issue. The parties should plan their proof to efficiently set the stage for the final altercation, on which they should focus the bulk of their proof.

In order to insure that the jury is properly focused on the limited question regarding the final shot, the Court will need to instruct the jury about the proper consideration it is to give to the evidence it will hear and see about the earlier uses of force. Such an instruction shall be given as one of the Court's preliminary instructions, and may be used as a cautionary reminder from time to time during

the trial.  In this regard, the Court invites both parties to submit proposed wording for such an instruction not later than **Friday, March 23, 2016**.[4]  Such proposed language should explain in clear, non-technical language, that the Court has already determined that the officers' actions preceding the final shot were objectively reasonable, but that there are contested fact issues about the circumstances at the time of the final shot which the jury must determine.

D.    The Autopsy Photos

This brings us to the autopsy photos.  Plaintiff has offered a large number – well over 100 – of rather gruesome autopsy photos.  There is no basis for the admission of such a large number of photos; in addition to the substantive problems with photos of this nature, this quantity would be unnecessarily duplicative and undoubtedly cumulative.  Plaintiffs' resistance to culling the photos down to a reasonable number of non-duplicative exhibits concerns the Court.  Such tactics suggest – as does the late alteration of positions on the facts about the final shot (discussed above) – that plaintiff's positions are tactical rather than substantive, and that the impermissible aspects of the gruesome photos may be precisely the point.  Nevertheless, the Court has itself carefully reviewed the photos to make the necessary evidentiary rulings.

As discussed above, the injuries Mr. Jaquez suffered before the final shot are material to the issues before the jury to the extent they are probative of the circumstances and Mr. Jaquez's physical capabilities at the time of the final shot.

---

[4] The Court notes that defendants included a proposed jury instruction on this topic, to which plaintiffs objected. (JPTO, Exh. C at 17 & n.12.)  Defendants may, if they choose, rely on this submission as their proposal.

The photos, while depicting many different aspects of different wounds, are probative of that question and are therefore relevant.  Fed. R. Evid. 401.  Relevance is not, however, wholly determinative of admissibility; the Court must also consider whether each photo's "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Given the number and nature of the photographs, as well as the questions that are and are not directly at issue in this trial, all of the Rule 403 concerns are implicated here and the vast bulk of the photos are excluded for that reason.

"[T]he Second Circuit has made clear that the graphic or disturbing nature of a photograph alone is not enough to render it inadmissible." United States v. Salim, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) (citing United States v. Velazquez, 246 F.3d 204, 210-11 (2d Cir. 2001)).  Evidence that may upset or disturb a jury is not thereby inadmissible, United States v. Salameh, 152 F.3d 88, 123 (2d Cir. 1998), if the probative value of that evidence is not substantially outweighed by the evidence's negative qualities.  Each piece of proposed evidence must be evaluated to determine how it will aid the jury's ability to find the facts on which the case turns. The Court has carefully reviewed each photo to assess it against Rule 403.

A number of the photos depict the internal damage Mr. Jaquez suffered during this incident.[5]  These photos are gruesome and implicate a substantial

---

[5] Specifically, these photos are PX 1102-1140.

danger of unfair prejudice because they are inflammatory, potentially mislead, and invite juror speculation.  To a lay person, such photos are repulsive and gory; they also all relate to wounds prior to the final shot.  Moreover, in themselves, they cannot inform a lay person as to the physical capabilities a man with Mr. Jaquez's personal characteristics would have had in light of such wounds.  It is, for instance, entirely possible that taking photos of the internal organs of a person wounded only slightly would produce materially similar photos.  Moreover, plaintiffs have not identified their own medical expert.  Their prior expert was precluded, and they declined the opportunity to identify a replacement witness.  (ECF Nos. 157 & 190.) Thus, they are presumably intending to rely solely on Dr. Landi, from the Office of the Chief Medical Examiner, or juror speculation to explain both what the photos show and more importantly how they are to assist the juror in assessing physical capabilities as of the final altercation.  However, even assuming Dr. Landi would be able to discuss various wounds' impact on physical capabilities, it would in all events be unnecessary to do so by the repeated, detailed, and graphic photos proffered by plaintiffs.  The jury could well be inflamed and disgusted and render a decision on that basis rather than according to the law, or be misled into believing that the early wounds are subject to review by them when they are not.

In addition to running a significant risk of inviting speculation rather than rational inference, such photos may also cause the jury to conflate damages attributable to the wounds not at issue in this trial with damages attributable to the sole wound which is.  The graphic nature of the photos heightens the risk that

the jury will stray from their task of assessing the harm proximately caused by the final shot.

Other photos depict the external wounds Mr. Jaquez suffered before the final shot.[6]  Like the photos of internal wounds discussed above, these photos threaten to influence the jury's damages deliberations by graphically depicting wounds that are not directly at issue in this trial.  The jury should, again, not be misled into isolating the prior wounds and assessing liability based on them, as that is not their task.  Instead, their task is to assess Mr. Jaquez's physical capabilities at the time of the final shot.  The collective and resulting physical impact of the prior shots is relevant to that question..  In this regard, the most comprehensive photos of Mr. Jaquez's injuries prior to the final shot are most probative and suffer from the fewest Rule 403 issues.  The Court has identified the photos which provide such an overview of the wounds.  Additional photos would be unnecessarily cumulative and waste time.  This limited group of photos allows the jury to be informed – when combined with admissible medical testimony[7] – of the overall impact the events prior to the final shot had on Mr. Jaquez's physical capabilities.  Accordingly, assuming an appropriate foundation is laid, the Court will allow only PX 1038-2, 1047, and 1068.  As to PX 1068, plaintiffs must crop the photo not to show Mr. Jaquez's head, as the front of his head is irrelevant to the issues on trial and unduly prejudicial.

---

[6] Specifically, these photos are PX 1032, 1033-1037-1, 1037-1041-1, 1041-1048, and 1053-1101.
[7] The Court is unclear as to what medical testimony plaintiffs will be relying on, as they have declined to call a medical expert after Dr. Sullivan was long ago precluded.  (ECF No. 157.)  The Court cautions plaintiffs that it will not allow arguments based on lawyer speculation as to the impact various wounds had on physical capabilities.

Another set of photos depict the external bullet wound Mr. Jaquez suffered from the final shot.[8]  These photos depict the wound for which the jury, if it determines Sgt. Flores is liable, will assess damages.  They therefore do not invoke concerns that the jury might expand its damages determination to reach wounds not at issue.  They are probative of material issues relating to the shot and wound at issue, and any damages flowing therefrom.  Accordingly, the Court will allow PX 1050.  Plaintiffs shall crop the photo to eliminate the portion of Mr. Jaquez's face from the sideburn line just in front of the ear forward.  The admission of these specific photos will permit the jury to draw rational inferences about contested facts, and their probative value is not substantially outweighed by the danger of impermissible effects.

The rest of the autopsy photos, for the reasons discussed above and because they would be needlessly cumulative of the admissible photos and other evidence, will be excluded.


        SO ORDERED.

Dated:        New York, New York
              March 17, 2016


                            _____
                                 KATHERINE B. FORREST
                                 United States District Judge

---

[8] Specifically, these photos are PX 1030-1032, 1036, 1037-2, and 1050-1051.